[Cite as *Case W. Res. Univ. v. Statt*, 2012-Ohio-1055.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97159**

## CASE WESTERN RESERVE UNIVERSITY

PLAINTIFF-APPELLANT

vs.

## CHRISTOPHER STATT, ET AL.

DEFENDANTS-APPELLEES

**JUDGMENT:**
**AFFIRMED**

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-745727

**BEFORE:**     Boyle, P.J., Jones, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**     March 15, 2012

**ATTORNEY FOR APPELLANT**

Peter M. Poulos
Senior Counsel and Chief Litigation Counsel
Case Western Reserve University
10900 Euclid Avenue
Cleveland, Ohio    44106-7020


**ATTORNEYS FOR APPELLEES**

**For Ohio Department of Job and Family Services**

Michael DeWine
Ohio Attorney General
30 East Broad Street
State Office Tower, 17th Floor
Columbus, Ohio    43215

Patrick MacQueeney
Assistant Attorney General
615 Superior Avenue, 11th Floor
Cleveland, Ohio    44113-1899

**For Ohio Unemployment Compensation Review Commission**

Unemployment Compensation, Ohio
Review Commission
145 South Front Street
P.O. Box 182299
Columbus, Ohio    43218

Christopher Statt, pro se
14189 Pine Forest Drive
Apartment 104
North Royalton, Ohio    44133


MARY J. BOYLE, P.J.:

**{¶1}** Employer-appellant, Case Western Reserve University ("CWRU"), appeals from a judgment of the Cuyahoga County Court of Common Pleas affirming the decision of the Unemployment Compensation Review Commission ("Review Commission"), allowing claimant-appellee, Christopher Statt's, claim for unemployment benefits on the basis that CWRU discharged him without just cause. CWRU raises four assignments of error for our review:

"[1.] The judgment/decision is unlawful.

"[2.] An error occurred when no just cause was found to terminate Mr. Statt.

"[3.] The judgment/decision is unreasonable.

"[4.] The judgment/decision is against the manifest weight of the evidence."

**{¶2}** Finding no merit to the appeal, we affirm.

<u>Procedural History and Factual Background</u>

**{¶3}** Statt worked at CWRU as a research assistant in the School of Medicine from September 1994 until December 18, 2009, when he was placed on "investigatory suspension" without pay for allegations of "inappropriate, unprofessional, and threatening-like conduct in the workplace." CWRU fired Statt by letter on February 15, 2010.

**{¶4}** Statt immediately filed a claim for unemployment benefits with appellee Ohio Department of Job and Family Services ("ODJFS"). ODJFS allowed the claim, finding that Statt was fired without just cause under R.C. 4141.29(D)(2)(a). CWRU

appealed. ODJFS issued a redetermination that affirmed the decision permitting benefits. CWRU appealed again and ODJFS transferred jurisdiction of the claim to the Review Commission for an evidentiary hearing. After holding an evidentiary hearing, the Review Commission found that Statt was fired without just cause and allowed the claim. CWRU filed a request for review with the Review Commission, but it was denied. CWRU subsequently filed a notice of appeal in the Cuyahoga County Court of Common Pleas, which affirmed the decision of the Review Commission allowing benefits.

{¶5} It is from this judgment that CWRU appeals. Although CWRU raises four assignments of error, they are related as to whether just cause existed to terminate him and, thus, they will be addressed together.

Just Cause and Standard of Review

{¶6} A claimant is not eligible for unemployment compensation benefits if the director of ODJFS finds that the claimant "quit work without just cause or has been discharged for just cause in connection with the individual's work." R.C. 4141.29(D)(2)(a).

{¶7} In *Irvine v. State, Unemployment Comp. Bd. of Review*, 19 Ohio St.3d 15, 482 N.E.2d 587 (1985), the Ohio Supreme Court discussed the meaning of "just cause" in the unemployment compensation context. "The term 'just cause' has not been clearly defined in our case law. '* * * Essentially, each case must be considered upon its

particular merits. Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.'" *Id.* at 17, quoting *Peyton v. Sun T.V.*, 44 Ohio App.2d 10, 12, 335 N.E.2d 751 (1975). "The critical issue is not whether an employee has technically violated some company rule, but * * * whether the employee, by his actions, [has] demonstrated an unreasonable disregard for his employer's best interests." *Manor W. Health Care & Ret. Ctr. v. Ohio Bur. of Emp. Servs.*, 7th Dist. No. 93CA95, 1994 WL 718785, *2 (Dec. 23, 1994).

{¶8} "The determination of what constitutes just cause must be analyzed in conjunction with the legislative purpose underlying the Unemployment Compensation Act." *Id.* The Act was "intended to provide financial assistance to an individual who had worked, was able and willing to work, but was temporarily without employment through no fault or agreement of his own." *Id.*, quoting *Salzl v. Gibson Greeting Cards*, 61 Ohio St.2d 35, 39, 399 N.E.2d 76 (1980).

{¶9} "Fault on an employee's part is an essential component of a just-cause termination." *Williams v. Ohio Dept. of Job & Family Serv.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031. "Fault, however, is not limited to willful or heedless disregard of a duty or a violation of an employer's instructions." *Id.*, citing *Tzangas, Plakas & Mannos v. Admr., Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 698, 653 N.E.2d 1207 (1995). Regarding "fault," the Ohio Supreme Court has explained:

An employer may properly find an employee unsuitable for the required work, and thus to be at fault, when: (1) the employee does not perform the required work, (2) the employer made known its expectations of the employee at the time of hiring, (3) the expectations were reasonable, and (4) the requirements of the job did not change substantially since the date of the original hiring for that particular position. *Tzangas* at paragraph four of syllabus.

{¶10} Moreover, the Ohio Supreme Court stressed in *Irvine* that the issue of whether an employee is discharged for "just cause" is a factual issue, and, as such, is primarily within the province of the Review Commission. *Id.* The high court explained:

> The determination of whether just cause exists necessarily depends upon the unique factual considerations of the particular case. Determination of purely factual questions is primarily within the province of the referee and the board. Upon appeal, a court of law may reverse such decisions only if they are unlawful, unreasonable, or against the manifest weight of the evidence. Like other courts serving in an appellate capacity, we sit on a court with limited power of review. Such courts are not permitted to make factual findings or to determine the credibility of witnesses. The duty or authority of the courts is to determine whether the decision of the board is supported by the evidence in the record. The fact that reasonable minds might reach different conclusions is not a basis for the reversal of the board's decision. Moreover, "[o]ur statutes on appeals from such decisions [of the board] are so designed and worded as to leave undisturbed the board's decisions on close questions. Where the board might reasonably decide either way, the courts have no authority to upset the board's decision." (Citations omitted.) *Irvine* at 18.

{¶11} Ten years after *Irvine*, in *Tzangas*, the Ohio Supreme Court reiterated the principle that while a reviewing court is not permitted to make factual findings or to determine the credibility of witnesses, they do have the duty to determine whether the board's decision is supported by the evidence in the record. *Tzangas* at 696, citing

*Irvine* at 18. "This duty is shared by all reviewing courts, from the first level of review in the common pleas court, through the final appeal in the [Supreme Court]." *Id.* The board's role as fact finder, however, "is intact; a reviewing court may reverse the board's determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence." *Id.* at 697. "The fact that reasonable minds might reach different conclusions is not a basis for the reversal of the board's decision." *Id.*, quoting *Irvine* at 18.

{¶12} The highly deferential judicial standard of review in unemployment compensation decisions is codified in R.C. 4141.282 ("Appeal to court of common pleas"), enacted in 2001. Section (H) of the statute states:

> The court shall hear the appeal on the certified record provided by the commission. If the court finds that the decision of the commission was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse, vacate, or modify the decision, or remand the matter to the commission. Otherwise, the court shall affirm the decision of the commission.

{¶13} Thus, this court must determine if the Review Commission's finding that Statt was terminated without just cause was unlawful, unreasonable, or against the manifest weight of the evidence. The issue is not whether Statt has the right to continue to work at CWRU or whether he was wrongfully terminated. Instead, the issue is whether Statt has the right to unemployment compensation benefits because CWRU terminated him without just cause as defined within the unemployment context.

Just Cause Determination

{¶14} Mitch Drumm, professor of pediatrics and director of research in the area where Statt worked, notified Statt that he was being fired via letter on February 15, 2010. In the letter, Drumm explained that CWRU had completed its investigation and found that Statt had violated university policy "Positive Correction Action III-3 — Disruptive, Disrespectful, Unprofessional and Inappropriate Behavior." According to the letter, CWRU had obtained evidence upon its investigation that Statt "presented unprofessional, inappropriate, and disruptive behavior" that was "disruptive to the laboratory's productivity and efficiency."

{¶15} In the letter, Drumm gave several examples of Statt's inappropriate behavior, including allegations that (1) Statt "became angry, agitated, and stormed around the laboratory" when "an experiment did not go right," (2) he cursed loudly at the equipment, using "bitch," "don't F — with me," and "damn," (3) employees from other laboratories on the same floor stated that it was not uncommon for Statt "to use profanity, be agitated, and angry," and (4) at a November 24, 2009 performance review with his immediate supervisor, Tracy Bohnfield, Statt "reacted in a manner that was inappropriate, unprofessional, and threatening-like" that was "visible through [his] body language and tone of voice to the point where [Bohnfield] felt intimidated."

{¶16} Drumm further explained in the letter that Statt discussed "inappropriate and unprofessional matters" with colleagues and supervisors, including making inappropriate jokes — even when the colleague asked him not to, talked about women in

a derogatory manner to colleagues, and talked about inappropriate personal matters. One specific example in the letter explained:

On 11/24/09, you asked your colleague if they wanted to hear a funny joke. They replied not really. You stated it would only take a minute and that they would think it was funny. You proceeded to tell your colleague in great detail how dirty the first floor bathroom was in the Biomedical Research Building. Then you stated you were going to the bathroom and could not find your private part. You stated you were feeling around down there for a few minutes trying to find it. In front of your colleagues, you began to feel around by your private area to illustrate what occurred. Then you stated that a dirty construction man came in beside you and let out a big moan when he let his urine go. Meanwhile, you were still trying to find your private part. The construction man looked at you and stated, "Did you lose it or something?" You stated to him, "I hope it had not atrophied or something." You then said that you kept feeling around until you realized your underwear [was] backwards.

{¶17} Drumm further notified Statt in the letter that he also violated university policy "Positive Correction Action III-3 — Failure to follow work instructions, disregard of authorized work request, and lack of cooperation." Drumm explained that on "numerous occasions," Statt's supervisor had told him that he needed to complete "more assays each week,"and that he needed to learn new technology, but that he became agitated when told to do so. Drumm told Statt in the letter

that as a Research Assistant IV, he should be "managing his work load," but instead, his supervisor still had to give him a "daily task list."

{¶18} Drumm testified that although he signed the letter, he did not write it. When the hearing officer began to question Drumm about the specific allegations of inappropriate behavior that were listed in the letter, Drumm stated that he did not have personal knowledge of the allegations and could not testify to them. He said that Statt's immediate supervisor, Tracy Bohnfield, would be able to, but he could not. Bohnfield, however, did not testify.

> Drumm did testify that he was personally aware that Statt's "hours at work were starting, were dropping off, and he was not handling the work load." Drumm said that Statt was never disciplined for this, but he believed that Bohnfield notified Statt in his performance review that he was deficient in this area. Drumm stated that the "disciplinary part of this was that he was not given a raise."

{¶19} Drumm testified that he was also aware that on November 24, 2009, Bohnfield met with Statt regarding his performance review. Bohnfield told Drumm that she felt threatened by Statt's actions because he "blew up at her" when she told him that he would only receive a one percent raise. Drumm testified the incident in Bohnfield's office "initiated * * * the investigation into other issues."

{¶20} The hearing officer questioned Statt about the specific allegations listed in his termination letter. Statt admitted that he used profanity in the lab, but not often, and he said that everyone used profanity in the lab. Statt denied that he got agitated, angry,

or stormed around the lab. Statt testified that he did leave his work area sometimes because the temperature was 86 degrees or higher in his lab, so he left to cool down. He denied that he blew up at Bohnfield. He explained that he did not raise his voice at her, he did not threaten her, he did not lean toward her, nor did he get out of his chair, but said that he did "frown" at her because he believed that he had met all of the requirements on his performance review and deserved more than a one percent raise.

{¶21} Statt admitted that he told jokes in the lab, but said that no one ever complained to him that they were offensive or told him to stop telling them. Statt further admitted that he did tell his coworker, Mary Kalosi, that he had gone to the restroom and was "having problems with his fly" because he had his underwear on backwards, and that a construction worker came in the restroom and said, "did you lose it or something?" But Statt denied that his coworker told him that she did not want to hear it nor did she tell him to stop telling her the story. He also said that Kalosi had told him similar stories over the years. He denied the remaining allegations relating to the event.

{¶22} Statt testified that he had never been disciplined before he was suspended on December 18, 2009. He said that the university never asked him if he did any of the things listed in his termination letter. He denied that his supervisor ever asked him to do more "assays" each week. But he did admit that his supervisor had been telling him "to learn new technology and update [his] skills." He also agreed that his supervisor gave

him a daily task list, but denied that he had ever been told why she did it. He agreed that he should have been disciplined for using expletives, but not that he deserved to be fired. Statt testified that he was never given an opportunity to tell his side of the story regarding the allegations in the termination letter.

**{¶23}** Carolyn Gerich, employee relations manager in the human resources department at CWRU, testified that she became involved with Statt's case on December 5, 2009, when Bohnfield reported to her that Statt had "exhibited inappropriate behavior in his review on November 24th." Gerich testified that Bohnfield told her that Statt was not a "major producer," that he was not "interested in learning the new technology or the techniques," and that over the past year, she had noticed a change in his behavior, such as not coming to work on time, and failing to call in when he was going to be late. Bohnfield also told Gerich that Kalosi "felt intimidated by him." Bohnfield told Gerich that she did not personally witness Statt cursing or making inappropriate comments, but said that she had heard about it from other employees.

**{¶24}** Gerich testified that as part of her investigation, she talked to several people in the lab who worked with Statt, including Kolasi, Connie Mae, David Fletcher, and "Lisa." She talked to these employees before Statt was suspended on December 18th. The only person who reported anything of a sexual nature was Kolasi regarding the restroom story where Statt told her he was trying to find his "private parts." Kolasi also reported that Statt "gets frustrated, [and] upset when things get moved." She

further reported that he "swears" and "slams doors" and says, "don't 'F' with me." Kolasi said that Statt is moody, comes in disheveled, and always talked about his personal life. Besides the restroom comment that was more recent, Kolasi said these things had happened over the years.

{¶25} Lisa told Gerich that Statt told an inappropriate joke to high school students, but could not say when it happened or what the joke was. Fletcher reported to Gerich that Statt comes to work disheveled, and had been pale and disoriented. Fletcher said that he asked Statt if he felt okay, and Statt told him that he had been bit by a spider. Fletcher also said that Statt swore at the equipment and belched. Fletcher further testified that Statt had not been getting his work done, but agreed that he was not Statt's supervisor. Fletcher did not give a time frame, but said these issues were ongoing.

{¶26} Gerich said that she told Statt these allegations on December 18th, before he was suspended. According to her notes, Statt said, "I am a perfectionist, when I screw up I'm frustrated. I am my own worst enemy." Statt also admitted that he swore at the machines. Gerich said she also talked to him about not being at his desk. Statt told her that he had been late a couple of times because he had to put his son or daughter on the bus. Gerich agreed with the hearing officer that the allegations about Statt not getting his work done should have been in the performance review that Bohnfield gave him on November 24, 2009.

{¶27} But the record reveals that the employee evaluation report that Statt received in November 2009, was positive. It did not allege any allegations of inappropriate or unprofessional behavior. Further, with respect to Statt's job performance, he received high ratings across the board of above average performance levels — from "strong" to "very strong" in categories ranging from "job knowledge/competency," "quality/quantity of work," "planning/organization," "initiative/commitment," "problem solving/creativity," "teamwork and cooperation," "interpersonal skills," and "communication." Indeed, many of his ratings were "very strong," which was the highest rating he could receive. He did not receive one score below — or even at — average. In the comment section, his supervisor also wrote positive comments, and concluded that he was a "good contributor." Statt received a one percent raise as part of the performance evaluation, which he was not happy about, but that does not indicate anything negative about his job performance or behavior.

{¶28} The Review Commission affirmed the director's redetermination decision with respect to its finding that CWRU discharged Statt without just cause. The hearing officer found Statt to be more credible than the testimony and hearsay evidence presented on behalf of CWRU. The hearing officer found that while CWRU alleged that Statt's performance has suffered for a long time, he had never been disciplined for it in the 15 years he had worked there. And although the hearing officer recognized that

under CWRU's policy, it did not have to offer progressive discipline, she suggested that maybe it should have in this case.

{¶29} Upon reviewing the record, the common pleas court determined that the Review Commission's decision was not against the manifest weight of the evidence, nor was it unlawful or unreasonable. The court noted that "Statt's final performance evaluation weighs heavily against CWRU's evidence that Statt engaged in inappropriate, and unprofessional behavior for a period of months." The court further noted that the record also did not support CWRU's allegations that "Statt was not managing his workload, that he failed to complete assignments in a timely manner, or that he was a disruptive force among his colleagues for months prior to his suspension." Finally, the trial court concluded that "there was no clear evidence that Statt engaged in behavior demonstrating an unreasonable disregard for CWRU's best interest."

{¶30} CWRU contends that by affirming the Review Commission's decision, the trial court imposed a duty upon CWRU to use its progressive discipline policy, rather than terminate Statt without warning. CWRU points out that despite the fact that it has a progressive discipline policy, the policy also allows for it to "terminate an employee at anytime, without any previous corrective action, if circumstances warrant." But the Review Commission did not impose a duty upon CWRU to use progressive discipline before terminating an employee. It merely suggested that under the facts of this case, it might have been helpful. *See Astro Shapes, Inc. v. Sevi*, 7th Dist. No. 09MA105,

2010-Ohio-750, 2010 WL 708997 (where the hearing officer simply noted that the employee had not received any discipline in over 20 years, this did not create a duty to warn; rather, it was merely the weighing of evidence and an example of why the hearing officer believed that the employee's conduct was not something  that a reasonable person would believe would result in termination).

{¶31} CWRU further argues that the Reviewing Commission's decision was unreasonable and against the manifest weight of the evidence because Statt admitted to leaving his work station, to "disruptive behavior in the lab," to telling off-color jokes, and to repeatedly swearing in the lab.   According to CWRU, those behaviors alone were enough to terminate Statt.  We disagree with CWRU's rendition of the facts.  Statt admitted to leaving his work station when he got hot; he did not admit to "regularly leaving his work station."   And although Statt admitted to swearing in the lab, he testified that he did not act any different than anyone else (CWRU's claim that Statt did not testify to these facts and only argued them in his closing argument is simply wrong). Finally, the "disruptive behavior" that Statt admitted to (according to the page number of the transcript cited to by CWRU) was leaving his workstation because he was "sweating profusely * * * and very unhappy with the fact that * * * the temperature in [his] workstation was 86 plus."

{¶32} Statt did admit to telling another employee, Mary Kalosi, a story about not being able to find his "private part" in the restroom because his underwear was on

backwards. But Statt explained that he thought it was a funny story and said that Kalosi had told him similar stories in the past. Further, Gerich testified that neither Kalosi, nor any of the other employees interviewed in the investigation, had ever complained about Statt in the past.

{¶33} Accordingly, after our own review of the record, we agree with the common pleas court. The Review Commission's decision is supported by the evidence in the record. Further, the Review Commission's decision is not against the manifest weight of the evidence, nor is it unlawful or unreasonable. CWRU's four assignments of error are overruled.

{¶34} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

LARRY A. JONES, SR., J., and
EILEEN A. GALLAGHER, J., CONCUR