[Cite as *Evans v. Ohio Department of Job & Family Servs.*, 2023-Ohio-4299.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| ANTOINETTE EVANS | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellant | : | Hon. Andrew J. King, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 23 CAE 04 0023 |
| DIRECTOR, OHIO DEPARTMENT | : |  |
| OF JOB AND FAMILY SERVICES | : |  |
|  | : | <u>OPINION</u> |
| Defendant-Appellee |  |  |

CHARACTER OF PROCEEDING:    Appeal from the Delaware County Court of
Common Pleas, Case No. CVF 09 0491

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY    November 27, 2023

APPEARANCES:

For Plaintiff-Appellant    For Defendant-Appellee

THOMAS CONDIT    BARTHOLOMEW T. FREEZE
P.O. Box 12700    GENEVIEVE M. HOFFMAN
Cincinnati, OH 45212    JOSEPH G. BOGDEWIECZ
    Capitol Square Office Building
    65 East State Street, Suite 800
DAVE YOST    Columbus, OH 43215
Attorney General
By: DAVID E. LEFTON    PATRICK J. SCHMITZ
Unemployment Compensation Unit    SANDRA R. MCINTOSH
30 East Broad Street, 26th Floor    SCOTT SCRIVEN, LLP
Columbus, OH 43215    250 E. Broad St. Suite 900
    Columbus, OH 43215

*Gwin, P.J.*

{¶1} Plaintiff-appellant Antoinette Evans ["Evans"] appeals the March 9, 2023 Opinion entered by the Delaware County Court of Common Pleas, which affirmed the decision of the State of Ohio Unemployment Compensation Review Commission ("Commission") which declined to review a hearing officer's determination that Evans's employer had just cause to terminate her employment, and disallowing her application for unemployment compensation benefits.

*Facts and Procedural History*

{¶2} In 2008, Evans joined the Olentangy Local School District ("District") as a "Cafeteria/Study Hall Aide" at Olentangy Liberty High School] ("Liberty"). 1R. at 159-160; 2R. at 883[1]. Evans received an Employee Handbook or access to an online copy when she was hired. 1R. at 167.

{¶3} Evans would daily converse with her students about a wide range of topics, some school-related and some not. Topics would include schools, jobs, the wrestling team, global events, and whatever students might bring up that day. 2R. at 695-696. According to the District, Evans's responsibilities were to: (1) exhibit professional behavior; (2) ensure student safety; (3) observe and report inappropriate student behavior; (4) engage the public with tact and diplomacy; (5) interact positively with staff, students, and parents; (6) promote good public relations; and (7) serve as a positive role model for students. 2R. at 446.

---

[1] For clarity, the telephone hearing held before the Commission and the record of this case will be referred to as, " R. ," signifying the volume and the page number.

{¶4} The District employs a progressive disciplinary policy. 1R. at 170. During Evans's employment, the District disciplined her on four separate occasions, the last of which led to her alleged constructive discharge that is the subject of this appeal. 2R. at 442.

*Evans's discipline for her off-duty Facebook posts and comments - April 2019*

*and September 2020*

{¶5} The District first disciplined Evans in April 2019 for several of her comments and posts on Facebook. 2R. at 445; 447. One post depicted the actor Jussie Smollett with a statement that "Jesse [sic] Smollett swearing on his mother. Folks he will have judgment day. His black privilege and star quality will not help him when he goes before God!" 2R. at 521. Evans also shared a picture of a transgender couple with a caption that the individuals in the photo are the gender of their biological sex, and commented, "She's a he" on a story concerning a transgender female wrestler. 2R. at 519; 522. Finally, Evans posted a picture of several members of Congress referred to as "the Squad" with the caption "We are being TAKEN OVER from WITHIN!!!! What's it gonna [sic] take America?!" 2R. at 520.

{¶6} When Evans made these comments and posts, her Facebook profile was publicly available and identified her as a District employee. 2R. at 445-446. On or around April 1, 2019, the District received 10-15 complaints about Evans's Facebook posts from parents, Liberty alumni, and members of the public. 2R. at 515. Multiple students also visited guidance counselors to discuss the posts, and at least three teachers told administrators that the posts were a major topic amongst the Liberty student body. 2R. at 515.

{¶7} On April 2, 2019 - the day after the District became aware of the posts - Liberty Principal Michael Stamer ("Principal Stamer") placed Evans on paid leave. 2R. at 515. Soon after, on April 4, 2019, Evans and representatives from the District met to discuss the incident, and the next day, the District suspended Evans for four days without pay and required her to complete professional training. 2R. at 445 447. In a letter to her announcing its decision, the District explained that Evans's posts "attracted negative publicity because they contradicted [the District's] mission as a public school district to 'facilitate maximum learning for *every* student.'" (Emphasis in original) 2R. at 445-446. Additionally, the District determined that Evans's posts raised questions about her ability to "credibly enforce Board policies ... that require employees to report incidents of bullying or harassment, hold students accountable for acceptable technology use, and ensure the care and protection of all students." 2R. at 446. Finally, the District warned Evans that - because her conduct concerned the fundamental expectations of her job - she could face disciplinary action up to and including termination for exhibiting unprofessional conduct in the future. 2R. at 447. On April 9, 2019, Evans signed the suspension letter and acknowledged that she understood it. 2R. at 447. The training included training on the Professional Code of Conduct for Educators. 1R. 164.

{¶8} Evans faced discipline again in September 2020 for commenting on another user's Facebook post that said, "If your students know your political affiliation you have failed as a teacher. Teachers are there to help students think for themselves not like you [,]" with, "Tell that to the English Department!" 1R. at 170; 2R. at 483-484, 498. Although Evans's profile was no longer publicly available, she removed her comment shortly after a Liberty English teacher questioned the intent behind Evans's remark. 2R. at 483. When

asked about the incident, Evans claimed that her comment was not directed toward anyone at Liberty but toward the English Department at her daughter's former college. 2R. at 483. The District, however, did not find this explanation credible because the post did not mention Evans's daughter, or her college. 2R. at 483. Further, the District noted that Evans's daughter had graduated from college more than eight years ago. Id.[2] Evans was given a "Documented Warning" after it had determined that Evans's comment "reflected poor professional judgment and/or violated" the District's social media policy and the Licensure Code of Professional Conduct for Ohio Educators. 2R. at 483.

*Discipline for in-school remarks – October 2020 and April 7, 2021*

{¶9} On October 14, 2020, Evans had a conversation with a student "M.S." Evans started that conversation by mentioning the experience of a Black student who had recently transferred to Liberty and whom Evans thought "hated" her new school. 2R. at 472.

{¶10} M.S. explained that the other student had transferred from a more diverse school, seemingly as an explanation for that student's challenges at Liberty. 2R. at 472. Evans downplayed this and recounted that she had experienced discrimination as a child because, as an Italian-American in that era, Evans "wasn't considered white." 2R. at 472. Evans also said that during certain parts of America's past, Italian Americans had it worse than Black Americans and were lynched more often. 2R. at 472. At some point in the conversation, M.S. mentioned that she was Black, and Evans asked, "Oh, you consider yourself that?" 2R. at 472. When M.S. confirmed her identity, Evans responded, "For the last two years I thought you were Indian because you're always studying." 2R. at 472. In

---

[2] Evans's corrected the District that her daughter had graduated four years, not eight, years prior to Evans's comments. 2R. at 487.

a previous conversation, Evans asked M.S. if her parents had been born in America. 2R. at 472.

{¶11} When M.S. shared her experiences as a Black student who had encountered race-related bias and discrimination at Liberty, Evans began to cry because she could not believe that other Liberty students would behave in such a way. 2R. at 472. Evans remained upset, and M.S. spent the last five minutes of the class period comforting her. 2R. at 472.

{¶12} The District held an investigatory meeting on November 16, 2020. 2R. at 470. In place of formal discipline, the District required Evans to attend individualized training to - according to the District's November 17, 2020 disciplinary letter to Evans - "assist [her] with appropriate interactions with diverse students in the district." 2R. at 470.

{¶13} Up to this point, the District provided Evans with training, in lieu of termination, in the following areas: implicit bias, building a safe and supportive school environment, separate trainings on the professional use of social media, microaggression and restorative education and separate trainings involving the Code of Professional Responsibility for Educators[3]. 1R. at 163-164.

{¶14} The final disciplinary incident occurred during a morning study hall on April 7, 2021. 1R. at 160; 2R. at 528. While Evans cleaned partitions that were used to limit the spread of COVID-19, she said to a student, "Can you believe the coronavirus came from China and that China is making money from sales of PPE to the United States?" (hereinafter referred to as "COVID comment") 1R. at 160; 2R. at 545, 883. A student of Chinese descent who was sitting nearby overheard the comment and left the study hall

---

[3] April 4, 2019, September 4, 2019 and August 21, 2020. 1R. at 164.

out of frustration and anger. 1R. at 182; 2R. at 545; 546. That student reported the incident to an assistant principal and received support from a guidance counselor. 2R. at 546. The student reported that the student felt offended, hurt, attacked and overall anger. 1R. at 179.

{¶15} On the evening of April 7, 2021, Principal Stamer told Evans not to report to work the next day. 2R. at 883. On April 8, 2021, the District placed Evans on paid administrative leave and scheduled an investigatory meeting for April 14, 2021 ("April 14th Meeting"), but the District did not inform Evans why she was placed on leave. 1R. at 205; 2R. at 542; 883. During the April 14th Meeting, Evans was accompanied by Gary Yashko ("Yashko"), who was a friend and real estate attorney. 2R. at 542. In attendance on behalf of the District were Assistant Director of Human Resources Jennifer Iceman ("Iceman"); Principal Stamer, a Liberty assistant principal, and an attorney for the District. (1R. at 161; 2R. at 542.) Iceman ran the meeting, the purpose of which was to collect information regarding the April 7, 2021 incident. 1R. at 162; 2R. at 883.

{¶16} Iceman asked Evans if she remembered having a conversation with the student, the content of the conversation, whether Evans had been provided training regarding implicit bias and cultural responsiveness, microaggressions and the code of professional responsibility. 1R. at 162-163.

{¶17} At first, Evans stated that she could not recall the incident. 1R. at 163. Evans eventually did admit to making the comment. 1R. at 208. Iceman asked Evans if she saw how her comments could be considered offensive. Evans responded, "yes, I can see that." 1R. at 164. When asked if she could see how her comments could make a student of Asian descent feel uncomfortable, Evans responded, "I'm not sure." Evans

acknowledged that she had reviewed the professional code of conduct during her three previous disciplinary proceedings. 1R. at 164. When asked what her interpretation of her obligation with regard to her students was in light of her training, Evans responded "I understand what I'm supposed to do and I didn't do what I was supposed to do." 1R. at 164. When asked if she considered her COVID comment to be in violation of the Code of Professional Conduct, Evans stated that she saw her comment as an economic statement. Id. Evans commented that "I sometimes make mistakes, I didn't do it deliberately, do anything on purpose." 1R. at 165. When asked what the administration could do to help her, Evans replied, "I don't' know what to say." Id.

{¶18} The District did not allow Evans to present evidence or call witnesses. 1R. at 161-165; 2R. at 883. Evans and Attorney Yashko were provided time to speak at the end of the meeting. 2R. at 852; 861.

{¶19} At the conclusion of the hearing the matter was taken under advisement. 1R. at 165. Evans was informed that she would be informed of the decision of the Board at a later time. Id. She remained on paid administrative leave. Id. at 165-166.

{¶20} The following day, on April 15, 2021, the District called Attorney Yashko to inform him that the District's representatives would recommend that the Board of Education terminate Evans's employment. 2R. at 883-884. The District also told Attorney Yashko that Evans had the option to resign before the formal termination process began. 2R. at 165-166, 716-718. On April 16, 2021, Evans resigned in a letter stating: "In lieu of termination, I hereby resign my position ...at Olentangy Liberty High School effective as of the end of my current contract for the 2020/2021 school year." 2R. at 443; 884. The

Board of Education accepted Evans's resignation on April 22, 2021, and Evans's last day as a District employee was May 27, 2021. 2R. at 884.

*Denial of Unemployment Benefits*

{¶21} Evans filed her Application for Determination of Benefit Rights on January 23, 2022, which was initially denied. 2R. at 882. Evans appealed that denial, and on March 23, 2022, the Ohio Department of Job and Family Services ("ODJFS") issued a Redetermination denying Evans's application, finding that she had been discharged with just cause. 2R. at 882. On April 12, 2022, Evans appealed to the Unemployment Compensation Review Commission ("UCRC"). 2R. at 882. Hearing Officer Delores Evans[4] ("Hearing Officer) held a telephone hearing on June 10, June 28, and July 21, 2022. 2R. at 882.

{¶22} During the UCRC hearing, Evans testified, "would I say it [the COVID statement] to an Asian student, probably not. But this kid was a white kid who I actually had a good relationship with. I just didn't think anything of it." 1R. at 209. Evans explained her reasons for resigning in lieu of termination,

> Well, I thought that if I resigned that that would give me the ability to
> work in other school districts. So, I had because my retirement… well, I can
> just go and uh, you know I can substitute…in another school district ….

1R. at 212. Evans attempted to rescind her resignation six weeks later because, "I didn't realize that was of no value" referring to her resignation and her ability to find work in a

---

[4] Nothing in the record suggests that Hearing Officer Delores Evans is related to Appellant Antoinette Evans.

different school district. 1R. at 212; 2R. at 865-866. She further testified that she was informed that "basically what happened is illegal." Id.

{¶23} Attorney Yashko testified at the UCRC hearing that he informed Evans that she did not have to resign, instead she could opt for a full *Loudermill* hearing. 2T. at 720. Iceman testified that if she had not opted to resign, Evans would have received a *Loudermill* hearing. 2R. at 860. A *Loudermill* hearing was not scheduled in Evans' case because the District received her resignation letter. Id.

{¶24} Evans called K.H. and J. K. parents from OLSD to testify at Evans' UCRC hearing about their objections to leftist politics, perverse sexuality, and other offensive topics in OLSD classrooms, hallways, and curricula.

{¶25} On July 29, 2022, the Hearing Officer concluded that Evans left her position under disqualifying conditions and that the District had just cause to discharge her, which precluded unemployment compensation (hereinafter, "Decision"). 2R. at 885. On August 24, 2022, UCRC denied Evans's request for further review of the Decision. 2R. at 933.

{¶26} On September 21, 2022, Evans filed an appeal to the Delaware County Court of Common Pleas.

{¶27} In her appeal, Evans maintained that she was constructively discharged due to disciplinary action that violated her constitutional rights under the First and Fourteenth Amendments to the United States Constitution. *Judgment Entry Affirming the Decision of the Unemployment Compensation Review Commission,* filed Mar 9, 2023 at 7 [hereinafter "*Judgment Entry*"]. Specifically, she identified five assignments of error in the Decision: (1) her COVID comment was constitutionally protected speech on a matter of public concern; (2) the District employed policies and an "unwritten (and unknowable) speech

code" that represent unconstitutional content and viewpoint discrimination; (3) the District arbitrarily enforced its policies against her and other conservatives, contra the Fourteenth Amendment's Equal Protection Clause;(4) the District's policies were unconstitutionally vague; and (5) she did not receive the procedural safeguards guaranteed by the Due Process Clause of the Fourteenth Amendment before the District coerced her resignation. Id. at 7-8.

*The trial judge's decision*

{¶28} Concerning Evans's First Amendment claims and whether Evans's COVID comment is constitutionally protected, the trial judge after carefully reviewing the federal standards concerning protected speech and the facts presented during the UCRC hearing concluded, "On the whole, these facts demonstrate that Evans spoke as a private citizen." *Judgment Entry* at 11.

{¶29} The trial judge next concluded,

Undoubtedly, COVID has been a matter of public concern since at least March 2020, and it continues to make headlines even now. Similarly, COVID's origin and China's role in the pandemic featured prominently in the public discourse throughout that period. Under the test outlined in *Pickering*, it is immaterial whether Evans's COVID comment was true, inappropriate, or controversial. *See Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Thus, because Evans spoke as a private citizen on a matter of public concern, her COVID comment is entitled to at least *some* First Amendment protections.

*Judgment Entry* at 12 (emphasis in original) (footnotes omitted). The trial judge then considered the balancing test described in *Pickering v. Bd. of Edn. of Twp. High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The trial judge first concluded,

> Evans's COVID comment was "couched in terms of political debate," as COVID and China's role in the pandemic have featured as hot-button political issues. Likewise, Evans lacked specialized knowledge on those topics, and her comment did not expose the District's or Liberty's inner workings. The fact that COVID's origin and any financial impact on China from the international response to the virus's spread were entirely unrelated to Evans's employment duties diminishes any public interest in her speech.

> All told, I find that the public's limited interest means that Evans's speech does not fall into the "highest rung" of protected speech under the First Amendment.

*Judgment Entry* at 14. The trial judge proceeded next to,

> Analyze the District's interest, as an employer, "in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568. Toward this end, I may consider Evans's past conduct to place her speech in context. *Kirkland u. City of Maryville, Tenn.,* 54 F.4th 901, 910 (6th Cir. 2022) (*citing Connick,* 461 U.S. at 152).

{¶30} To gauge the District's interest in promoting efficiency, the trial judge noted "there are four 'pertinent considerations,' which call for an assessment of the degree to which Evans's speech: (1) impaired harmony among co-workers or discipline by

superiors; (2) interfered with close working relationships that require personal loyalty and confidence; (3) impeded her job performance or interfered with the District's regular operation; and (4) undermined the District's mission. *Rankin [v. McPherson]*, 483 U.S. [378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)] at 388." *Judgment Entry* at 14. The trial judge found that Evans's conduct became a frequent source of tension within the high school, with teachers reporting that her behavior was "all that students are talking about" on at least one occasion. 2R. at 515. Further, from April 2019 through April 2021, Evans's conduct caused multiple students to report her conduct and prompted more than a dozen parents, teachers, and Liberty alumni to file complaints with the District. *Judgment Entry* at 15. The trial judge found that the first consideration-which calls for him to weigh any disruption to harmony among co-workers and any impact on workplace discipline - supports the District. Id.

**{¶31}** Next, the trial judge analyzed whether Evans's speech interfered with close working relationships and whether it hindered her job performance or the District's operations. Id. The trial judge concluded,

> Evans's comment hurt her relationship with her students. In her position, Evans had the fundamental obligation to be a positive role model. And more importantly, she was tasked with the care of minors, a relationship where trust is paramount. The extent to which Evans damaged her relationship with her students is demonstrated by the fact that her conduct caused at least two students to report her behavior to the school and one to request a transfer out of Evans's classroom.

*Judgment Entry* at 16. The trial judge concluded, "that the impact on working relationships

is a significant interest that weighs in the District's favor."

{¶32} The trial judge found Evans's speech did affect her job performance and the District's operations. "Beyond serving as a positive role model, Evans's responsibilities were to: (1) exhibit professional behavior; (2) ensure student safety; (3) observe and report inappropriate student behavior; (4) engage the public with tact and diplomacy; (5) interact positively with staff, students, and parents; and (6) promote good public relations." 2R. at 446. *Judgment Entry* at 16. The trial judge noted that Evans's pattern of inappropriate behavior points to an inability on her part to learn from her mistakes or to change her behavior to meet her employer's needs and expectations. Id.

{¶33} Next, the trial judge considered the effect of Evans's conduct on the District's mission, and found Evans, on multiple occasions, undermined the District's mission to "facilitate maximum learning for *every* student." Id. at 17 (emphasis in original). On balance, the trial judge found that the District's interest in promoting the efficiency of its services outweighs Evans's First Amendment interests in making her COVID comment. Id. at 18. The trial judge concluded, "the District did not violate Evans's First Amendment right to speak on a matter of public concern." Id. at 19.

{¶34} Concerning Evans's arguments on content and view point discrimination under the First Amendment, the trial judge found, "Evans admitted that the District did not tell employees or students that they could not discuss COVID, effectively dispelling her claim that the District discriminated based on the content of her comment. 2R. at 687. Likewise, the Hearing Officer's findings demonstrate that the District's actions were not taken simply to avoid the 'discomfort and unpleasantness' that accompany an unpopular viewpoint, but instead in response to the disruption that Evans's comment caused. As

already discussed, Evans's COVID comment materially and substantially disrupted Liberty's learning environment. I, therefore, conclude that the District did not engage in unconstitutional content or viewpoint discrimination under the First Amendment." *Judgement Entry* at 19.

**{¶35}** Concerning Evans's Fourteenth Amendment claims the trial judge found that the District's policies, on their face, do not target any suspect classifications; Evans does not allege that she is a member of a class that would warrant heightened scrutiny; Evans has provided little evidence beyond bare assertions that the District selectively enforced its policies to target conservatives; and the record in fact indicates that the District enforced its policies against a "liberal" teacher for improper social media use and discussions in the classroom. See 2R. at 838-842. The trial judge found that "the District did not target a suspect class when it enforced its policies." Id. at 21-22.

**{¶36}** Further, "The United States Supreme Court's holding in *Engquist v. Oregon Department of Agriculture* explicitly excluded the 'class-of-one' theory from public-employment cases. 553 U.S. 591, 607, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) ('the class-of-one theory of equal protection has no application in the public employment context'). Nothing Evans puts forward detracts from that observation or *Engquist's* applicability to her case." *Judgment Entry* at 24.

**{¶37}** Finally, the trial judge found Evans's vagueness challenge fails because the District's policies and her training on those policies, provided sufficient notice that her COVID comment would lead to discipline. Id. at 26. The trial judge found Evans's arguments "concerning and unwritten (and unknowable) speech code" to be

unpersuasive because she did not identify this supposed speech code or provide evidence that it exists. Id.

{¶38} The trial judge found Evans's claim that she was coerced to resign was not supported by the record. The judge pointed to the fact that she was accompanied at the meeting by Attorney Gary Yashko. Attorney Yashko received the District's call that it would recommend termination. Attorney Yashko even helped Evans draft her letter of resignation. 2R. at 716. Further, Attorney Yashko told Evans that, had she requested a hearing to call her own witnesses and present evidence before an impartial adjudicator, she would have had such an opportunity. 2R. at 720, 884. *Judgment Entry* at 28-29.

{¶39} The trial judge affirmed the UCRC's determination. Id. at 30. On March 9, 2023, the trial judge issued a 30-page decision finding that the UCRC's determination was not unlawful, unreasonable, or against the manifest weight of the evidence.

*Assignments of Error*

{¶40} Evans raises one Assignment of Error,

{¶41} "I. THE LOWER COURT ERRED BY AFFIRMING THE UCRC'S DETERMINATION THAT APPELLEE OLENTANGY LOCAL SCHOOL DISTRICT HAD TERMINATED APPELLANTS' EMPLOYMENT FOR CAUSE."

**Standard of Appellate Review**

{¶42} An appeal of a decision rendered by the Commission is governed by R.C. 4141.282(H), which provides, in pertinent part:

If the court finds that the decision is unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse, vacate, or

modify the decision, or remand the matter to the commission. Otherwise, such court shall affirm the decision of the commission.

{¶43} A reviewing court may not reverse the commission's decision simply because "reasonable minds might reach different conclusions." *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶ 20. Pursuant to R.C. 4141.282(H), a reviewing court may reverse the Commission's decision "only if it is unlawful, unreasonable or against the manifest weight of the evidence." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 1995-Ohio-206, 653 N.E.2d 1207 (1995), paragraph one of the syllabus. This standard applies in "all reviewing courts, from the first level of review in the common pleas court, through the final appeal in" the Supreme Court of Ohio. Id. at 696.

{¶44} "The claimant has the burden of proving [his or] her entitlement to unemployment compensation benefits * * *." *Irvine v. State Unemp. Comp. Bd. of Rev.*, 19 Ohio St.3d 15, 17, 482 N.E.2d 587 (1985); *Sturgeon v. Lucas Plumbing & Heating, Inc.*, 9th Dist. Lorain No. 11CA010010, 2012-Ohio-2240, ¶ 4. Pursuant to R.C. 4141.29(D)(2)(a), an individual is not eligible for unemployment compensation benefits if he or she has been "discharged for just cause in connection with the individual's work." The term "just cause" has been defined as "'that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.'" *Irvine* at 17, *quoting Peyton v. Sun T.V.*, 44 Ohio App.2d 10, 12 (10th Dist. 1975). The high court explained:

> The determination of whether just cause exists necessarily depends upon the unique factual considerations of the particular case. Determination of purely factual questions is primarily within the province of the referee and

the board. Upon appeal, a court of law may reverse such decisions only if they are unlawful, unreasonable, or against the manifest weight of the evidence. Like other courts serving in an appellate capacity, we sit on a court with limited power of review. Such courts are not permitted to make factual findings or to determine the credibility of witnesses. The duty or authority of the courts is to determine whether the decision of the board is supported by the evidence in the record. The fact that reasonable minds might reach different conclusions is not a basis for the reversal of the board's decision. Moreover, "[o]ur statutes on appeals from such decisions [of the board] are so designed and worded as to leave undisturbed the board's decisions on close questions. Where the board might reasonably decide either way, the courts have no authority to upset the board's decision." (Citations omitted.)

*Irvine,* 19 Ohio St.3d at 18, 482 N.E.2d 587; *Warrensville Hts. v. Jennings*, 58 Ohio St.3d 206, 207, 569 N.E.2d 489(1991); *Case W. Res. Univ. v. Statt*, 8th Dist. Cuyahoga No. 97159, 2012-Ohio-1055, ¶ 10.

{¶45} "[W]hat constitutes just cause must be analyzed in conjunction with the legislative purpose underlying the Unemployment Compensation Act. Essentially, the Act's purpose is 'to enable unfortunate employees, who become and remain *involuntarily* unemployed by adverse business and industrial conditions, to subsist on a reasonably decent level and is in keeping with the humanitarian and enlightened concepts of this modern day.'" (Emphasis sic.) *Irvine* at 17, *quoting Leach v. Republic Steel Corp.*, 176 Ohio St. 221, 223, 27 O.O.2d 122, 199 N.E.2d 3 (1964); *Williams v. Ohio Dept. of Job &*

*Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶ 22. However, "[t]he Act does not exist to protect employees from themselves, but to protect them from economic forces over which they have no control. When an employee is at fault, he is no longer the victim of fortune's whims, but is instead directly responsible for his own predicament. Fault on the employee's part separates him from the Act's intent and the Act's protection. Thus, fault is essential to the unique chemistry of a just cause termination." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d at 697–698, 653 N.E.2d 1207; *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶23. Fault, however, is not limited to willful or heedless disregard of a duty or a violation of an employer's instructions. *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶ 24, *citing Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d at 698. Fault may arise from willful or heedless disregard of a duty, a violation of an employer's instructions, or unsuitability for a position. *Williams* at ¶ 24; *Moore v. Ohio Unemp. Comp. Rev. Comm.*, 10th Dist. Franklin No. 11AP-756, 2012-Ohio-1424, ¶ 21.

{¶46} Just cause for dismissal exists when an employee's actions demonstrate an unreasonable disregard for the employer's best interests. *See, e.g., Midwest Terminals of Toledo Internatl., Inc. v. Dir., Ohio Dept. of Job & Family Servs.*, 6th Dist. Lucas No. L–15–1193, 2016–Ohio–973; *Kohl v. Health Mgt. Solutions, Inc.,* 10th Dist. Franklin No. 15AP–17, 2015–Ohio–4999, ¶ 18; *Hartless v. Ohio Dept. of Job & Family Servs.,* 4th Dist. Pickaway No. 10CA27, 2011–Ohio–1374 ¶ 22; *Ehrhart v. Dir., Ohio Dept. of Job & Family Servs.*, 4th Dist. Scioto No. 16CA3726, 2016-Ohio-5786, ¶ 21.

**{¶47}** Thus, this Court must determine if the Review Commission's finding that Evans was terminated with just cause was unlawful, unreasonable, or against the manifest weight of the evidence. In other words, the issue is whether Evans has the right to unemployment compensation benefits because the District terminated her employment without just cause as defined within the unemployment context. *Case W. Res. Univ. v. Statt*, 8th Dist. Cuyahoga No. 97159, 2012-Ohio-1055, ¶ 13.

**{¶48}** We are required to focus on the decision of the commission, rather than that of the trial court. *Irvine v. State Unemp. Comp. Bd. of Rev.*, 19 Ohio St.3d 15, 17, 482 N.E.2d 587 (1985), ¶18; *Huth v. Director, Ohio Dept. of Job and Family Services*, 5th Dist. Tuscarawas No. 2014 AP 03 0011, 2014-Ohio-5408; *Perkins v. Ohio Dep't of Job & Family Servs.*, 10th Dist. Franklin No. 18AP-900, 2019-Ohio-2538, 2019 WL 2605225, ¶ 11, *citing Carter v. Univ. of Toledo,* 6th Dist. No. L-07-1260, 2008-Ohio-1958, 2008 WL 1837254, ¶ 12; *Meinerding v. Coldwater Exempted Village School Dist. Bd. of Education*, 3rd Dist. No. 10-19-06, 2019-Ohio-3611, 143 N.E.3d 1147, ¶ 18.

**Issue for Appellate review:** *Whether the UCRC's decision is unlawful, unreasonable or against the manifest weight of the evidence.*

*The record does not support that Evans was coerced to resign*

**{¶49}** Evan's first argues that her resignation was coerced. [Appellant's brief at 18-19].

**{¶50}** In her decision, the Hearing Officer noted, "an employee who resigns in anticipation of being discharged must be judged by the same criteria as if the discharge had actually taken place. In such a case, the employee has just cause to quit employment

only if the employer does not have just cause to discharge the employee." *UCRC Decision July 29, 2022* at 5, 2R. 882. R.C. 4141.29(D)(2)(a), provides, in relevant part:

> (D) * * * [N]o individual may * * * be paid benefits * * *:

> (2) For the duration of the individual's unemployment if the director finds that:

> (a) The individual quit his work without just cause or has been discharged for just cause in connection with the individual's work, * * *.

**{¶51}** Thus, the Hearing Officer utilized the correct standard. In the case at bar, the focus is on whether the District had just cause to terminate Evans's employment. The Hearing Officer concluded that the District "had just cause to discharge [Evans]. [Evans's] misconduct was contrary to the employer's best interests and represents fault that will serve to suspend her unemployment compensation benefits." *UCRC Decision July 29, 2022* at 7. "Because the District had just cause, Evans quit her employment with the District without just cause when presented with an inevitable discharge." Id.

**{¶52}** As the trial court noted, the record supports that Evans was accompanied at the April 14th meeting by Attorney Gary Yashko. Attorney Yashko received the District's call that it would recommend termination. Attorney Yashko helped Evans draft her letter of resignation. 2R. at 716. Further, Attorney Yashko told Evans that, if she requested a hearing to call her own witnesses and present evidence before an impartial adjudicator, she would have such an opportunity. 2R. at 720, 884. Evans testified that when she submitted her letter of resignation, she had hopes of attaining employment in a different school district. 1R. at 212.

**{¶53}** The record supports that Evans had three prior disciplinary violations and

had attended investigatory meetings with counsel in 2019 and 2020. The record supports that Evans had time and the opportunity after the April 14, 2021 meeting to discuss her options with an attorney and weigh her decision. The District further allowed Evans to finish out the school year, which allowed her to work an additional six weeks after she submitted her resignation. Evans contends that because she could not access her school email account she was constructively discharged. However, Evans presented no evidence that she asked for a *Loudermill* hearing, or that the District would have denied her such a hearing had she requested one in lieu of resigning.

{¶54} Thus, the UCRC decision that Evans quit her employment with the District without just cause when presented with an inevitable discharge is supported by competent, credible evidence, and is not unlawful, unreasonable or against the manifest weight of the evidence.

*The record contains competent, credible evidence that Evans resigned in lieu of requesting a Loudermill hearing*

{¶55} Evans next argues the that the District violated Evans' procedural due process rights by terminating her employment without a hearing. [Appellant's brief at 20-21].

{¶56} In Ohio, a state-employed teacher or aide possesses a property interest in continued employment. See R.C. 124.11 and 3319.081. Before the state may deprive an employee of that interest, the Due Process Clause requires certain procedural safeguards, an example being a *Loudermill* hearing. *See Cleveland Bd. of Edn. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). As the *Loudermill* Court noted in the *pre-deprivation* due process hearing, "The tenured public employee is

entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *See Arnett v. Kennedy,* 416 U.S., at 170–171, 94 S.Ct., at 1652–1653 (opinion of POWELL, J.); id., at 195–196, 94 S.Ct., at 1664–1665 (opinion of WHITE, J.); *see also Goss v. Lopez*, 419 U.S., at 581, 95 S.Ct., at 740. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). *See also, Ohio Assn. of Pub. School Emp., AFSCME, AFL-CIO v. Lakewood City School Dist. Bd. of Edn.*, 68 Ohio St.3d 175, 177, 624 N.E.2d 1043, 1045 (1994) (discussing pre and post deprivation hearing requirements).

{¶57} The record establishes that at the April 14, 2021 investigatory meeting Evans was given notice of the charges against her, an explanation of the District's evidence, and at the end of the hearing an opportunity for her and Attorney Yashko to speak in order to present her side of the story. 1R. at 162-165; 2R. at 528; 852; 861. Evans admitted that she was permitted to speak at the meeting. 2T. at 683. The record further establishes that Evans was accompanied at the meeting by Attorney Gary Yashko. 1R. at 206; 2R. at 709. Attorney Yashko received the District's call that it would recommend termination. Attorney Yashko helped Evans draft her letter of resignation. 2R. at 716. Further, Attorney Yashko told Evans that, if she requested a hearing to call her own witnesses and present evidence before an impartial adjudicator, she would have such an opportunity. 2R. at 720, 884. Evans testified that when she submitted her letter of resignation, she had hopes of attaining employment in a different school district. 1R. at

212. Iceman testified that if she had not opted to resign, Evans would have received a *Loudermill* hearing. 2R. at 860. A *Loudermill* hearing was not scheduled in Evans' case because the District received her resignation letter. Id.

{¶58} Appellate courts are not permitted to make factual findings or to determine the credibility of the witnesses; but the reviewing court does have the duty to determine whether the Review Commission's decision is supported by the evidence in the record. *Tzangas, Plakas & Mannos v. Administrator, Ohio Bureau of Employment Services*, 73 Ohio St.3d 694, 653 N.E.2d 1207 (1995). This leaves the board's role as a factfinder intact. Id. Where the commission might reasonably decide either way, this Court has no authority to upset the Commission's decision. *Bonannvo v. Ohio Dept. of Job & Family Services*, 5th Dist. Tuscarawas No. 2012 AP 02 0011, 2012-Ohio-5167; *Williams v. Ohio Dept. of Job & Family Servs.,* 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031. "Every reasonable presumption must be in favor of the [decision] and the findings of fact [of the Review Commission]." Id.

{¶59} We find the record contains competent, credible evidence supporting the Hearing Officer's finding that "[Evans] would have been given a proper due process hearing prior to being formally discharged, but she was offered the option of resigning. On April 16, 2021, [Evans] submitted her resignation, effective at the end of the 2020-2021 school year. On April 22, 2021, the Board accepted [Evans's] resignation effective May 27, 2021." *UCRC Decision July 29, 2022* at 5. Evans presented no evidence that she asked for a *Loudermill* hearing, or that the District would have denied her such a hearing had she requested one in lieu of resigning.

{¶60} After reviewing the record, we find that the UCRC's decision that the District

did not violate Evans' procedural due process rights by terminating her without a hearing is not unlawful, unreasonable or against the manifest weight of the evidence.

*The District's interest in promoting the efficiency of its services outweighs Evans's First Amendment public concern interests in making her COVID comment and did not result in viewpoint or content-based discrimination*

**{¶61}** Evans next contends that the District disciplined her in retaliation for her speech on a matter of public concern, and resulted in content-based and viewpoint-based discrimination. [Appellant's brief at 22-25; 26-27]. Specifically, Evans argues that because all the students were wearing masks, and she was always wearing PPE while cleaning, and "I know the district spent a half a million dollars on PPE," her China comment was directly relevant to the District's operations. [Appellant's brief at 23].

**{¶62}** As recognized by the trial judge, Evans admitted that the District never told employees or students that they could not discuss COVID. 2R. at 687. Further, as noted by the trial judge, Evans was not ordered to make the COVID comment, and the factual backdrop behind her speech shows that she spoke as a private citizen, not as a District employee. 1R. at 203. Her knowledge of COVID and its origins was limited to the internet, social media, and news reports, just as any other citizen. Evans had no official responsibility to investigate the virus, its origin, or China's role in the pandemic. 2R. at 685-687. However, as the trial judge noted, "because Evans spoke as a private citizen on a matter of public concern, her COVID comment is entitled to at least *some* First Amendment protections." *Judgment Entry* at 12.

**{¶63}** In *Rankin v. McPherson,* the United State Supreme Court noted a balancing test is applied in order to accommodate the dual role of the public employer as a provider

of public services and as a government entity operating under the constraints of the First Amendment. 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315(1987). The speaker's interest in making the statement must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *McPherson,* 483 U.S. at 388*, citing Pickering v. Bd. of Edn. of Twp. High School Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

{¶64} Pertinent considerations concern whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Pickering*, 391 U.S., at 570–573, 88 S.Ct., at 1735–1737.

{¶65} From April 2019 through April 2021, Evans's conduct caused multiple students to report her conduct and prompted more than a dozen parents, teachers, and Liberty alumni to file complaints with the District. *Judgment Entry* at 15. Upon our own review of the record, we find that the record contains competent, credible evidence that demonstrates Evans's comment hurt her relationship with her students and the parents. 1T. at 172-73; 174; 175; 187; 2R. at 472-474; 515.

{¶66} Evans had multiple disciplinary incidents, disrupting the high school's operation and its learning environment each time. Because of this, the Hearing Officer found that Evans "appear[ed] to be either unable or unwilling to fully comprehend the significant impact of her conduct on students and the broader community, the disruption to a positive school environment, and the effect on the school's public image." *UCRC Decision July 29, 2022* at 5.

{¶67} The record supports that Evans was informed as early as 2019 that her insensitive comments were contradictory to the District's mission statement and "created considerable disruption to our operation." 2R. at 446. (Apr. 5, 2019 letter to Evans from Todd R. Meyer, Chief Operations Officer regarding the Apr. 4, 2019 pre-disciplinary hearing). (Evans signed this letter on April 9, 2019. 2R. at 447). In response to a question during the investigatory hearing, Evans stated that she was not familiar with the Professional Code of Conduct for Educators. 2R. at 511.

{¶68} In a letter dated September 29, 2020, Evans was informed that her comment with respect to "Tell that to the English Department," demonstrated a repeated and persistent pattern of poor judgment. 2R. at 483. Evans was further informed that her comments have compromised her ability to work with staff, created a negative influence for students and violated a position of trust as a positive role model for students. Id. Evans was directed "to refrain from engaging in any other unprofessional or unethical behavior or violations of Board policies. If you do not follow these directives, you will face further disciplinary action up to and including termination." Id

{¶69} The District provided Evans with training, in lieu of termination, in the following areas: implicit bias, building a safe and supportive school environment, separate trainings on the professional use of social media, microaggression and restorative education and three separate trainings involving the Code of Professional Responsibility for Educators[5]. 1R. at 163-164; 2R. at 480.

{¶70} Here, Evans, on multiple occasions, undermined the District's mission to "facilitate maximum learning for *every* student." (Emphasis in original) 2R. at 445.

---

[5] April 4, 2019, September 4, 2019 and August 21, 2020. 1R, at 164.

Further, this was Evans's fourth infraction in two years. And yet, as observed by the Hearing Officer, Evans "continued to voice her opinions" "without regard to her role [,] and . . . her conduct clearly displayed that she could not be trained to act in the employer's best interests." 2R. at 884-885.

{¶71} Upon our own review of the record, we agree with the trial judge's comprehensive analysis concluding that "the District's interest in promoting the efficiency of its services outweighs Evans's First Amendment interests in making her COVID comment." We further agree with the trial judge that the record contains competent, credible evidence that the District did not engage in content-based or viewpoint-based discrimination. The record contains competent, credible evidence that Evans was aware that her comments were affecting her job performance, her relationship with the students, and the District's operations and mission statement. The decision of the UCRC is not unlawful, unreasonable or against the manifest weight of the evidence.

*Evans was not denied equal protection*

{¶72} The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

{¶73} Evans presented no evidence that she is a member of a suspect class warranting a strict scrutiny analysis. Evans's argument that the District targeted her for her conservative views is not supported by the record. Iceman testified that the policies apply to all faculty and staff. 1R. at 172. She further testified that Evans was not disciplined because of her political views. Id. at 176. The record reflects that, concerning the 2019 comments a second District employee was also disciplined. 1R. at 216; 2R. at

515. Further, the District enforced its policies against a "liberal" teacher for improper social media use and discussions in the classroom. *See,* 2R. at 838-842.

{¶74} From April 2019 through April 2021, Evans's conduct caused multiple students to report her conduct and prompted more than a dozen parents, teachers, and Liberty alumni to file complaints with the District. *Judgment Entry* at 15. *See also,* 1T. at 172-73; 174; 175; 187; 2R. at 472-474; 515. This was Evans's fourth infraction in two years. Evans was advised in 2019 and in 2020 how her comments were impacting the work environment, her relationship with the students, parents and her co-workers. Evans was advised that her insensitive comments were contradictory to the District's mission statement and "created considerable disruption to our operation." 2R. at 446. The District provided Evans with training, in lieu of termination, in the following areas: implicit bias, building a safe and supportive school environment, separate trainings on the professional use of social media, microaggression and restorative education and three separate trainings involving the Code of Professional Responsibility for Educators[6]. 1R. at 163-164; 2R. at 480.

{¶75} As the trial judge correctly noted, the United States Supreme Court's holding in *Engquist v. Oregon Department of Agriculture* explicitly excluded the "class-of-one" theory from public-employment cases. 553 U.S. 591, 607, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) ("the class-of-one theory of equal protection has no application in the public employment context"). Evans does not attempt to show or to argue in this appeal that *Engquist* is not applicable to her case.

{¶76} Upon our own review, we find that the record contains competent, credible

---

[6] April 4, 2019, September 4, 2019 and August 21, 2020. 1R. at 164.

evidence supporting that the District did not target a suspect class and did not deny Evans equal protection, and the decision of the UCRC is not unlawful, unreasonable or against the manifest weight of the evidence.

*Evans individualized training for prior disciplinary infractions sufficiently informed*

*Evans of the District's expectations for employee behavior*

{¶77} Evans next contends that the District has an "unwritten (and unknowable) speech code" that is void for vagueness under the Fourteenth Amendment's Due Process Clause. [Appellant's brief at 28-29].

{¶78} The Hearing Officer found that Evans,

[H]ad a prior history of counseling, specialized training, and discipline after making disparaging public social media posts, asking inappropriate questions about a student's parent's' nationality, and making racially-charged and insensitive comments to a Black student. Although [Evans] asserted that she had no intention of harming anyone through her posts or commentary, she appears to be either unable or unwilling to fully comprehend the significant impact of her conduct on students and the broader community, the disruption to a positive school environment, and the effect on the school's public image. The investigation team found [Evans] to be untrainable due to her inability to adapt to the societal changes around her (specifically at OLHS).

***

[Evans] acknowledged, in hindsight, that she should not have made her October 2020 comments or her April 7, 2021 statement. [Evans]

received training and counseling in 2019 and 2020 but nevertheless continued to voice her opinions without regard to her role and the employer's immense task and precarious position. [Evans] did not exhibit professionalism, sound judgment, or promote good public relations, and her conduct clearly  displayed that she could not be trained to act in the employer's best interest.

{¶79} The record demonstrates that Evans received training on November 23, 2020, December 2, 2020 and December 9, 2020 on microaggression and restorative education. 1R. at 163; 2R. at 480. Evans further received trainings on the professional use of social media; trainings on the Code of Professional Conduct for Educators on April 4, 2019, September 4, 2019 and August 21, 2022, and training on implicit bias and building a safe and supportive school environment. 1R. at 163-164; 2R. at 480. These training sessions all took place before Evans made her April 7, 2021 COVID comments. Evans admitted that she understood "what I am suppose to do and I didn't do what I was suppose to do." 1R. at 164. She further admitted that she was advised April 2, 2019 and September 29, 2020 that any future violations of school policy would result in discipline up to and including termination of employment. 1R. at 169; 2R. at 445; 682. The April 5, 2019 letter regarding Evans's "Unpaid suspension, Directives and Final Warning" clearly informed Evans that her "insensitive comments" contradicted the District's mission statement and created "considerable disruption" to the District's operations. The letter clearly informed Evans of her "essential functions" as an employee. Evans was also advised that concerns were raised by "several students, parents and/or other members of the public." 2R. at 445.

advised that concerns were raised by "several students, parents and/or other members of the public." 2R. at 445.

**{¶80}** Thus, competent, credible evidence supports the finding that Evans knew or should have known that her COVID comments could lead to discipline. The record does not support Evans's contention that she was unaware her COVID comments could lead to discipline. The decision of the UCRC that the District's policies are not void for vagueness under the Fourteenth Amendment's Due Process Clause is not unlawful, unreasonable or against the manifest weight of the evidence. Accordingly, Evans's rights under the Due Process Clause of the Fourteenth Amendment were not violated.

## Conclusion

**{¶81}** Upon our own review of the record, we agree with the trial court that the UCRC decision is supported by competent, credible evidence, and is not unlawful, unreasonable or against the manifest weight of the evidence.

**{¶82}** Based on the foregoing, Evans's assignment of error is overruled.

**{¶83}** The March 9, 2023 judgment entry of the Delaware County Court of Common Pleas is affirmed.

By Gwin, P.J., and

Wise, J., concurs;

King, J., dissents

*King, J. dissents*

{¶ 84} I would reverse the determination of the UCRC because I conclude Evans's COVID "microaggression" does not represent just cause sufficient to deny benefits. The majority of the panel concludes otherwise; therefore, I dissent.

{¶ 85} To begin, I disagree that the burden of proof rests on any claimant. The current formulation of the statute states, "No person shall impose upon the claimant or the employer any burden of proof as is required in a court of law." R.C. 4141.281(C)(2). As our colleagues in the Seventh District recognized, this statutory change supersedes prior case law. *Struthers v. Morell*, 164 Ohio App.3d 709, 2005-Ohio-6594, 843 N.E.2d 1231, ¶ 12 (7th Dist.). Under this proper formulation, we cannot uphold a UCRC determination under the notion that a claimant failed to carry the burden of proof. In my view, this error in formulation was present in the trial court's opinion, and then repeated in the majority's opinion. *See,* Trial Court's March 9, 2023 Judgment Entry at page 10.

{¶ 86} The purpose of unemployment compensation is to provide financial assistance to individuals who have lost their employment through no fault of their own, i.e., without just cause. *See Salzl v. Gibson Greeting Cards, Inc.,* 61 Ohio St.2d 35, 39, 399 N.E.2d 76 (1980). In order to accomplish this purpose, we are directed to liberally interpret certain statutes. R.C. 4141.46. In this context, both the Third and Seventh Districts have concluded that the legislative intent is to presume that employees are entitled to receive benefits. *Tomlinson v. Ohio Department of Job and Family Services*, 3d Dist. Allen No. 1-09-02, 2009-Ohio-3414, ¶ 6; *Abate v. Wheeling-Pittsburgh Steel Corp.,* 126 Ohio App.3d 742, 748-749, 711 N.E.2d 299 (7th Dist.1998). The Second, Sixth, Eighth, Ninth, and Tenth Districts arrived at a similar conclusion as well. *Bates v.*

*Airborne Express, Inc.,* 186 Ohio App.3d 506, 2010-Ohio-741, 928 N.E.2d 1168, ¶ 9 (2d Dist.); *Schivelbein v. Riverside Mercy Hospital,* 6th Dist. Lucas No. L-11-1208, 2012-Ohio-3991, ¶ 13; *Shephard v. Ohio Department of Job and Family Services,* 166 Ohio App.3d 747, 753, 2006-Ohio-2313, 853 N.E.2d 335, ¶ 21 (8th Dist.); *Niskala v. Director, Ohio Department of Job & Family Services,* 9th Dist. Medina No. 10CA0086-M, 2011-Ohio-5705, ¶ 9; *Bennett v. Department of Job and Family Services,* 10th Dist. Franklin No. 11AP-1029, 2012-Ohio-2327, ¶ 6. It also appears the Twelfth District reached the same conclusion.

{¶ 87} Before the Twelfth District, the UCRC argued that this presumption in favor of awarding benefits was improper, but the court of appeals rejected the argument. *Harmon v. Ohio Department of Job and Family Services,* 12th Dist. Butler No. CA2021-08-105, 2022-Ohio-1142, ¶ 31-32. Our colleagues' determinations are further bolstered by the subsequent Supreme Court of Ohio case holding courts are no longer required to defer to administrative agency interpretations. *TWISM Enterprises, L.L.C. v. State Board of Registration for Professional Engineers & Surveyors*, --- N.E.3d ---, 2022-Ohio-4677, ¶ 3.

{¶ 88} For the sake of statewide consistency, I would follow the overwhelming majority of our sister appellate courts and begin with the proposition a claimant is entitled to receive benefits. In this light, under R.C. 4141.281(C)(2), the hearing officer must ensure that evidence at hand is sufficient to overcome the presumption a claimant is entitled to receive benefits before denying benefits. As it relates here, the hearing officer was required under R.C. 4141.29(D)(2) to determine if the submitted evidence sufficiently demonstrated that Evans was terminated for just cause.

{¶ 89} I agree with the majority that the hearing officer correctly reviewed the alleged inevitable discharge under the standard of whether the employer had just cause to terminate employment. But I do not agree the evidence before the hearing officer was sufficient to demonstrate just cause and thus rightly deny Evans benefits.

{¶ 90} Whether a claimant's conduct rises to the level of just cause is not subject to a bright line rule, instead it must be examined on a case-by-case basis. *Irvine v. State Unemployment Compensation Board of Review,* 19 Ohio St.3d 15, 17, 482 N.E.2d 587 (1985). Although, the Supreme Court did provide some rough guidance by stating: " 'Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.' " *Id.,* quoting *Peyton v. Sun T.V.,* 44 Ohio App.2d 10, 12, 335 N.E.2d 751 (10th Dist.1975).

{¶ 91} Moreover, there is a distinction between the conduct that may warrant dismissal and "the further degree of misconduct or fault required on the part of the employee to justify a denial of unemployment benefits." *James v. Ohio State Unemployment Review Commission,* 10th Dist. Franklin No. 08AP-976, 2009-Ohio-5120, ¶ 12. In other words, an employer may have the right to discharge an employee for certain conduct, but that does not automatically equate to just cause under R.C. 4141.29(D)(2) to deny that employee benefits. In that regard, it is entirely possible Evans would fail to win a wrongful discharge claim, yet be entitled to receive benefits. As I explain below, it is unnecessary to directly reach the constitutional issues raised, although I view it presents a much more significant obstacle to the denial of benefits than stated by the majority.

{¶ 92} The proximate conduct at issue here is Evans's overheard COVID comment: "Can you believe the coronavirus came from China and that China is making money from the sales of PPE to the United States?" The school district's concern was not so much that this statement was made, but rather its impact on a particular student who was of Asian descent and became upset after hearing this comment. Indeed, the school district's brief referred to the statement itself as an "Anti-Asian microaggression." While the facts surrounding the origin of COVID-19 continue to be hotly debated, the statement itself lacks the sort of racially charged slurs, opinions, statements, or distasteful "joking" that usually precede an employee's discharge.

{¶ 93} In my view, whatever legal authority an employer has to punish a microaggression with termination, a microaggression will usually fall well short of demonstrating sufficient just cause to overcome a worker's presumption to unemployment benefits. In support of the UCRC's decision, the school district gestures at the broadly worded statement of principles adopted by the school district, and that Evans violated those rules. Again, violations of those laudable aspirations might well support lawful discharge, but not necessarily the denial of unemployment benefits. Ordinarily, the UCRC reviews the violation of company rules that are far more objective, such as being ready for work at the assigned start time, using internet for only business purposes, procedures for use of sick time, and so on. The workplace rules at issue here approach the "be a good employee and support company objectives" level of specificity that is, in my view, insufficient to support a finding of just cause for violating a company rule.

{¶ 94} As I read the record, Evans has been repeatedly disciplined and on November 17, 2020, she was placed on something roughly equivalent to a last chance

agreement. We can assume without deciding that on November 17, 2020, just cause existed to terminate her. But the school district decided to proceed otherwise. If the conduct at issue here were truly actionable, then her prior conduct would be relevant and would certainly support the UCRC's finding. But the school district gave her another chance, which it cannot now take back. Because the single microaggression is not either a violation of workplace rules or independent evidence of her unsuitability for her position, the prior discipline is of no import.

{¶ 95} Finally, I believe much of the discussion by the trial court and majority is unnecessary. With regard to Evan's claimed constitutional violations of equal protection and procedural due process, I fail to see how either is relevant to whether Evans's microaggression was sufficient just cause to support the UCRC's denial of her unemployment benefits. Those may well be independent claims related to wrongful discharge she can raise in another forum, but, as explained above, we do a disservice to the purpose and structure of the Unemployment Compensation Act to interject those here.

{¶ 96} Regarding the free speech claims, I agree the UCRC has to ensure that any denial of unemployment benefits comports with the United States Constitution. *See, e.g., Sherbert v. Verner*, 374 U.S. 398, 410, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). But the trial court's analysis expressly placed the burden on Evans to prove a first amendment violation. This was an error under R.C. 4141.281(C)(2). The factors examined by the federal district court in *Brandenburg v. Housing Authority of Irvine,* 253 F.3d 891, 897 (6th Cir.2001), placed the burden on the former employee because the employee as plaintiff had the burden of proof. That is not the case here. Thus, this illustrates the danger of

conflating standards relevant to wrongful discharge cases with the standard of just cause under the unemployment compensation system.

{¶ 97} Further, whenever the UCRC has to assure itself it is behaving constitutionally in denying benefits, it should proceed cautiously in applying federal precedent. As illustrated above, the framework in which those cases arise are often remarkably different. Moreover, as discussed by Judge Murphy in *Bennett v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 977 F.3d 530, 547 (6th Cir.2020) (Murphy, J., concurring), the "state-as-the-employer" free speech law revolves around "two incomparable values—a public employee's interest in speaking about politics and a public employer's interest in its efficient operations." If the balancing in federal court is a delicate affair with the benefit of discovery and the adversarial nature of litigation, then the UCRC should be circumspect in denying benefits under any framework driven by "two incompatible values."

{¶ 98} Thus, in my view, in many circumstances, with the difficulty in assessing this area of the law coupled with the presumption of awarding benefits, the discharged worker should receive benefits and thus avoid consideration of this perilous doctrine altogether. It follows then that I am not nearly as convinced as the trial court and the majority about a conclusion to deny benefits premised on the lack of merits of the free speech claim here. I would conclude the UCRC's determination of just cause was unreasonable and thus believe it should be reversed on that ground.