[Cite as *Evans v. Dir., Ohio Dept. of Job & Family Servs.*, 2023-Ohio-4299.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
| ANTOINETTE EVANS | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellant | : | Hon. Andrew J. King, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 23 CAE 04 0023 |
| DIRECTOR, OHIO DEPARTMENT | : |  |
| OF JOB AND FAMILY SERVICES | : |  |
|  | : | *NUNC PRO TUNC* O P I N I O N |
| Defendant-Appellee | : |  |

CHARACTER OF PROCEEDING:    Appeal from the Delaware County Court of
Common Pleas, Case No. CVF 09 0491

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY:    December 4, 2023

APPEARANCES:

For Plaintiff-Appellant                    For Defendant-Appellee

THOMAS CONDIT                         BARTHOLOMEW T. FREEZE
P.O. Box 12700                            GENEVIEVE M. HOFFMAN
Cincinnati, OH 45212                     JOSEPH G. BOGDEWIECZ
                                                    Capitol Square Office Building
                                                    65 East State Street, Suite 800
DAVE YOST                                  Columbus, OH 43215
Attorney General
By: DAVID E. LEFTON
Unemployment Compensation Unit       PATRICK J. SCHMITZ
30 East Broad Street, 26th Floor         SANDRA R. MCINTOSH
Columbus, OH 43215                       SCOTT SCRIVEN, LLP
                                                      250 E. Broad St. Suite 900
                                                      Columbus, OH 43215

*Gwin, P.J.*

{¶1}   Plaintiff-appellant Antoinette Evans ["Evans"] appeals the March 9, 2023 Opinion entered by the Delaware County Court of Common Pleas, which affirmed the decision of the State of Ohio Unemployment Compensation Review Commission ("Commission") which declined to review a hearing officer's determination that Evans's employer had just cause to terminate her employment, and disallowing her application for unemployment compensation benefits.

*Facts and Procedural History*

{¶2}   In 2008, Evans joined the Olentangy Local School District ("District") as a "Cafeteria/Study Hall Aide" at Olentangy Liberty High School] ("Liberty"). 1R. at 159-160; 2R. at 883[1]. Evans received an Employee Handbook or access to an online copy when she was hired. 1R. at 167.

{¶3}   Evans would daily converse with her students about a wide range of topics, some school-related and some not. Topics would include schools, jobs, the wrestling team, global events, and whatever students might bring up that day. 2R. at 695-696. According to the District, Evans's responsibilities were to: (1) exhibit professional behavior; (2) ensure student safety; (3) observe and report inappropriate student behavior; (4) engage the public with tact and diplomacy; (5) interact positively with staff, students, and parents; (6) promote good public relations; and (7) serve as a positive role model for students. 2R. at 446.

---

[1] For clarity, the telephone hearing held before the Commission and the record of this case will be referred to as, "__R.__," signifying the volume and the page number.

{¶4} The District employs a progressive disciplinary policy. 1R. at 170. During Evans's employment, the District disciplined her on four separate occasions, the last of which led to her alleged constructive discharge that is the subject of this appeal. 2R. at 442.

*Evans's discipline for her off-duty Facebook posts and comments - April 2019 and September 2020*

{¶5} The District first disciplined Evans in April 2019 for several of her comments and posts on Facebook. 2R. at 445; 447. One post depicted the actor Jussie Smollett with a statement that "Jesse [sic] Smollett swearing on his mother. Folks he will have judgment day. His black privilege and star quality will not help him when he goes before God!" 2R. at 521. Evans also shared a picture of a transgender couple with a caption that the individuals in the photo are the gender of their biological sex, and commented, "She's a he" on a story concerning a transgender female wrestler. 2R. at 519; 522. Finally, Evans posted a picture of several members of Congress referred to as "the Squad" with the caption "We are being TAKEN OVER from WITHIN!!!! What's it gonna [sic] take America?!" 2R. at 520.

{¶6} When Evans made these comments and posts, her Facebook profile was publicly available and identified her as a District employee. 2R. at 445-446. On or around April 1, 2019, the District received 10-15 complaints about Evans's Facebook posts from parents, Liberty alumni, and members of the public. 2R. at 515. Multiple students also visited guidance counselors to discuss the posts, and at least three teachers told administrators that the posts were a major topic amongst the Liberty student body. 2R. at 515.

{¶7}    On April 2, 2019 - the day after the District became aware of the posts - Liberty Principal Michael Stamer ("Principal Stamer") placed Evans on paid leave. 2R. at 515. Soon after, on April 4, 2019, Evans and representatives from the District met to discuss the incident, and the next day, the District suspended Evans for four days without pay and required her to complete professional training. 2R. at 445 447. In a letter to her announcing its decision, the District explained that Evans's posts "attracted negative publicity because they contradicted [the District's] mission as a public school district to 'facilitate maximum learning for *every* student.'" (Emphasis in original) 2R. at 445-446. Additionally, the District determined that Evans's posts raised questions about her ability to "credibly enforce Board policies ... that require employees to report incidents of bullying or harassment, hold students accountable for acceptable technology use, and ensure the care and protection of all students." 2R. at 446. Finally, the District warned Evans that - because her conduct concerned the fundamental expectations of her job - she could face disciplinary action up to and including termination for exhibiting unprofessional conduct in the future. 2R. at 447. On April 9, 2019, Evans signed the suspension letter and acknowledged that she understood it. 2R. at 447. The training included training on the Professional Code of Conduct for Educators. 1R. 164.

{¶8}    Evans faced discipline again in September 2020 for commenting on another user's Facebook post that said, "If your students know your political affiliation you have failed as a teacher. Teachers are there to help students think for themselves not like you [,]" with, "Tell that to the English Department!" 1R. at 170; 2R. at 483-484, 498. Although Evans's profile was no longer publicly available, she removed her comment shortly after a Liberty English teacher questioned the intent behind Evans's remark. 2R. at 483. When

asked about the incident, Evans claimed that her comment was not directed toward anyone at Liberty but toward the English Department at her daughter's former college. 2R. at 483. The District, however, did not find this explanation credible because the post did not mention Evans's daughter, or her college. 2R. at 483. Further, the District noted that Evans's daughter had graduated from college more than eight years ago. Id.[2] Evans was given a "Documented Warning" after it had determined that Evans's comment "reflected poor professional judgment and/or violated" the District's social media policy and the Licensure Code of Professional Conduct for Ohio Educators. 2R. at 483.

*Discipline for in-school remarks – October 2020 and April 7, 2021*

**{¶9}** On October 14, 2020, Evans had a conversation with a student "M.S." Evans started that conversation by mentioning the experience of a Black student who had recently transferred to Liberty and whom Evans thought "hated" her new school. 2R. at 472.

**{¶10}** M.S. explained that the other student had transferred from a more diverse school, seemingly as an explanation for that student's challenges at Liberty. 2R. at 472. Evans downplayed this and recounted that she had experienced discrimination as a child because, as an Italian-American in that era, Evans "wasn't considered white." 2R. at 472. Evans also said that during certain parts of America's past, Italian Americans had it worse than Black Americans and were lynched more often. 2R. at 472. At some point in the conversation, M.S. mentioned that she was Black, and Evans asked, "Oh, you consider yourself that?" 2R. at 472. When M.S. confirmed her identity, Evans responded, "For the last two years I thought you were Indian because you're always studying." 2R. at 472. In

---

[2] Evans's corrected the District that her daughter had graduated four years, not eight, years prior to Evans's comments. 2R. at 487.

a previous conversation, Evans asked M.S. if her parents had been born in America. 2R. at 472.

{¶11} When M.S. shared her experiences as a Black student who had encountered race-related bias and discrimination at Liberty, Evans began to cry because she could not believe that other Liberty students would behave in such a way. 2R. at 472. Evans remained upset, and M.S. spent the last five minutes of the class period comforting her. 2R. at 472.

{¶12}  The District held an investigatory meeting on November 16, 2020. 2R. at 470. In place of formal discipline, the District required Evans to attend individualized training to - according to the District's November 17, 2020 disciplinary letter to Evans - "assist [her] with appropriate interactions with diverse students in the district." 2R. at 470.

{¶13} Up to this point, the District provided Evans with training, in lieu of termination, in the following areas: implicit bias, building a safe and supportive school environment, separate trainings on the professional use of social media, microaggression and restorative education and separate trainings involving the Code of Professional Responsibility for Educators[3]. 1R. at 163-164.

{¶14}  The final disciplinary incident occurred during a morning study hall on April 7, 2021. 1R. at 160; 2R. at 528. While Evans cleaned partitions that were used to limit the spread of COVID-19, she said to a student, "Can you believe the coronavirus came from China and that China is making money from sales of PPE to the United States?" (hereinafter referred to as "COVID comment") 1R. at 160; 2R. at 545, 883. A student of Chinese descent who was sitting nearby overheard the comment and left the study hall

---

[3] April 4, 2019, September 4, 2019 and August 21, 2020. 1R. at 164.

out of frustration and anger. 1R. at 182; 2R. at 545; 546. That student reported the incident to an assistant principal and received support from a guidance counselor. 2R. at 546. The student reported that the student felt offended, hurt, attacked and overall anger. 1R. at 179.

{¶15} On the evening of April 7, 2021, Principal Stamer told Evans not to report to work the next day. 2R. at 883. On April 8, 2021, the District placed Evans on paid administrative leave and scheduled an investigatory meeting for April 14, 2021 ("April 14th Meeting"), but the District did not inform Evans why she was placed on leave. 1R. at 205; 2R. at 542; 883. During the April 14th Meeting, Evans was accompanied by Gary Yashko ("Yashko"), who was a friend and real estate attorney. 2R. at 542. In attendance on behalf of the District were Assistant Director of Human Resources Jennifer Iceman ("Iceman"); Principal Stamer, a Liberty assistant principal, and an attorney for the District. (1R. at 161; 2R. at 542.) Iceman ran the meeting, the purpose of which was to collect information regarding the April 7, 2021 incident. 1R. at 162; 2R. at 883.

{¶16} Iceman asked Evans if she remembered having a conversation with the student, the content of the conversation, whether Evans had been provided training regarding implicit bias and cultural responsiveness, microaggressions and the code of professional responsibility. 1R. at 162-163.

{¶17} At first, Evans stated that she could not recall the incident. 1R. at 163. Evans eventually did admit to making the comment. 1R. at 208. Iceman asked Evans if she saw how her comments could be considered offensive. Evans responded, "yes, I can see that." 1R. at 164. When asked if she could see how her comments could make a student of Asian descent feel uncomfortable, Evans responded, "I'm not sure." Evans

acknowledged that she had reviewed the professional code of conduct during her three previous disciplinary proceedings. 1R. at 164. When asked what her interpretation of her obligation with regard to her students was in light of her training, Evans responded "I understand what I'm supposed to do and I didn't do what I was supposed to do." 1R. at 164. When asked if she considered her COVID comment to be in violation of the Code of Professional Conduct, Evans stated that she saw her comment as an economic statement. Id. Evans commented that "I sometimes make mistakes, I didn't do it deliberately, do anything on purpose." 1R. at 165. When asked what the administration could do to help her, Evans replied, "I don't' know what to say." Id.

{¶18}  The District did not allow Evans to present evidence or call witnesses. 1R. at 161-165; 2R. at 883. Evans and Attorney Yashko were provided time to speak at the end of the meeting. 2R. at 852; 861.

{¶19}  At the conclusion of the hearing the matter was taken under advisement. 1R. at 165. Evans was informed that she would be informed of the decision of the Board at a later time. Id. She remained on paid administrative leave. Id. at 165-166.

{¶20}  The following day, on April 15, 2021, the District called Attorney Yashko to inform him that the District's representatives would recommend that the Board of Education terminate Evans's employment. 2R. at 883-884. The District also told Attorney Yashko that Evans had the option to resign before the formal termination process began. 2R. at 165-166, 716-718. On April 16, 2021, Evans resigned  in a letter stating:  "In lieu of termination, I hereby resign my position ...at Olentangy Liberty High School effective as of the end of my current contract for the 2020/2021 school year." 2R. at 443; 884. The

Board of Education accepted Evans's resignation on April 22, 2021, and Evans's last day as a District employee was May 27, 2021. 2R. at 884.

*Denial of Unemployment Benefits*

{¶21} Evans filed her Application for Determination of Benefit Rights on January 23, 2022, which was initially denied. 2R. at 882. Evans appealed that denial, and on March 23, 2022, the Ohio Department of Job and Family Services ("ODJFS") issued a Redetermination denying Evans's application, finding that she had been discharged with just cause. 2R. at 882. On April 12, 2022, Evans appealed to the Unemployment Compensation Review Commission ("UCRC"). 2R. at 882. Hearing Officer Delores Evans[4] ("Hearing Officer) held a telephone hearing on June 10, June 28, and July 21, 2022. 2R. at 882.

{¶22} During the UCRC hearing, Evans testified, "would I say it [the COVID statement] to an Asian student, probably not. But this kid was a white kid who I actually had a good relationship with. I just didn't think anything of it." 1R. at 209. Evans explained her reasons for resigning in lieu of termination,

> Well, I thought that if I resigned that that would give me the ability to work in other school districts. So, I had because my retirement… well, I can just go and uh, you know I can substitute…in another school district ….

1R. at 212. Evans attempted to rescind her resignation six weeks later because, "I didn't realize that was of no value" referring to her resignation and her ability to find work in a

---

[4] Nothing in the record suggests that Hearing Officer Delores Evans is related to Appellant Antoinette Evans.

different school district. 1R. at 212; 2R. at 865-866. She further testified that she was informed that "basically what happened is illegal." Id.

**{¶23}** Attorney Yashko testified at the UCRC hearing that he informed Evans that she did not have to resign, instead she could opt for a full *Loudermill* hearing. 2T. at 720. Iceman testified that if she had not opted to resign, Evans would have received a *Loudermill* hearing. 2R. at 860. A *Loudermill* hearing was not scheduled in Evans' case because the District received her resignation letter. Id.

**{¶24}** Evans called K.H. and J. K. parents from OLSD to testify at Evans' UCRC hearing about their objections to leftist politics, perverse sexuality, and other offensive topics in OLSD classrooms, hallways, and curricula.

**{¶25}** On July 29, 2022, the Hearing Officer concluded that Evans left her position under disqualifying conditions and that the District had just cause to discharge her, which precluded unemployment compensation (hereinafter, "Decision"). 2R. at 885. On August 24, 2022, UCRC denied Evans's request for further review of the Decision. 2R. at 933.

**{¶26}** On September 21, 2022, Evans filed an appeal to the Delaware County Court of Common Pleas.

**{¶27}** In her appeal, Evans maintained that she was constructively discharged due to disciplinary action that violated her constitutional rights under the First and Fourteenth Amendments to the United States Constitution. *Judgment Entry Affirming the Decision of the Unemployment Compensation Review Commission,* filed Mar 9, 2023 at 7 [hereinafter "*Judgment Entry*"]. Specifically, she identified five assignments of error in the Decision: (1) her COVID comment was constitutionally protected speech on a matter of public concern; (2) the District employed policies and an "unwritten (and unknowable) speech

code" that represent unconstitutional content and viewpoint discrimination; (3) the District arbitrarily enforced its policies against her and other conservatives, contra the Fourteenth Amendment's Equal Protection Clause;(4) the District's policies were unconstitutionally vague; and (5) she did not receive the procedural safeguards guaranteed by the Due Process Clause of the Fourteenth Amendment before the District coerced her resignation. Id. at 7-8.

*The trial judge's decision*

**{¶28}** Concerning Evans's First Amendment claims and whether Evans's COVID comment is constitutionally protected, the trial judge after carefully reviewing the federal standards concerning protected speech and the facts presented during the UCRC hearing concluded, "On the whole, these facts demonstrate that Evans spoke as a private citizen." *Judgment Entry* at 11.

**{¶29}** The trial judge next concluded,

Undoubtedly, COVID has been a matter of public concern since at least March 2020, and it continues to make headlines even now. Similarly, COVID's origin and China's role in the pandemic featured prominently in the public discourse throughout that period. Under the test outlined in *Pickering*, it is immaterial whether Evans's COVID comment was true, inappropriate, or controversial. *See Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Thus, because Evans spoke as a private citizen on a matter of public concern, her COVID comment is entitled to at least *some* First Amendment protections.

*Judgment Entry* at 12 (emphasis in original) (footnotes omitted). The trial judge then considered the balancing test described in *Pickering v. Bd. of Edn. of Twp. High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The trial judge first concluded,

> Evans's COVID comment was "couched in terms of political debate," as COVID and China's role in the pandemic have featured as hot-button political issues. Likewise, Evans lacked specialized knowledge on those topics, and her comment did not expose the District's or Liberty's inner workings. The fact that COVID's origin and any financial impact on China from the international response to the virus's spread were entirely unrelated to Evans's employment duties diminishes any public interest in her speech.
>
> All told, I find that the public's limited interest means that Evans's speech does not fall into the "highest rung" of protected speech under the First Amendment.

*Judgment Entry* at 14. The trial judge proceeded next to,

> Analyze the District's interest, as an employer, "in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568. Toward this end, I may consider Evans's past conduct to place her speech in context. *Kirkland u. City of Maryville, Tenn.,* 54 F.4th 901, 910 (6th Cir. 2022) (*citing Connick,* 461 U.S. at 152).

**{¶30}** To gauge the District's interest in promoting efficiency, the trial judge noted "there are four 'pertinent considerations,' which call for an assessment of the degree to which Evans's speech: (1) impaired harmony among co-workers or discipline by

superiors; (2) interfered with close working relationships that require personal loyalty and confidence; (3) impeded her job performance or interfered with the District's regular operation; and (4) undermined the District's mission. *Rankin [v. McPherson]*, 483 U.S. [378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)] at 388." *Judgment Entry* at 14. The trial judge found that Evans's conduct became a frequent source of tension within the high school, with teachers reporting that her behavior was "all that students are talking about" on at least one occasion. 2R. at 515. Further, from April 2019 through April 2021, Evans's conduct caused multiple students to report her conduct and prompted more than a dozen parents, teachers, and Liberty alumni to file complaints with the District. *Judgment Entry* at 15. The trial judge found that the first consideration-which calls for him to weigh any disruption to harmony among co-workers and any impact on workplace discipline - supports the District. Id.

{¶31} Next, the trial judge analyzed whether Evans's speech interfered with close working relationships and whether it hindered her job performance or the District's operations. Id. The trial judge concluded,

> Evans's comment hurt her relationship with her students. In her position, Evans had the fundamental obligation to be a positive role model. And more importantly, she was tasked with the care of minors, a relationship where trust is paramount. The extent to which Evans damaged her relationship with her students is demonstrated by the fact that her conduct caused at least two students to report her behavior to the school and one to request a transfer out of Evans's classroom.

*Judgment Entry* at 16. The trial judge concluded, "that the impact on working relationships

is a significant interest that weighs in the District's favor."

{¶32} The trial judge found Evans's speech did affect her job performance and the District's operations. "Beyond serving as a positive role model, Evans's responsibilities were to: (1) exhibit professional behavior; (2) ensure student safety; (3) observe and report inappropriate student behavior; (4) engage the public with tact and diplomacy; (5) interact positively with staff, students, and parents; and (6) promote good public relations." 2R. at 446. *Judgment Entry* at 16. The trial judge noted that Evans's pattern of inappropriate behavior points to an inability on her part to learn from her mistakes or to change her behavior to meet her employer's needs and expectations. Id.

{¶33} Next, the trial judge considered the effect of Evans's conduct on the District's mission, and found Evans, on multiple occasions, undermined the District's mission to "facilitate maximum learning for *every* student." Id. at 17 (emphasis in original). On balance, the trial judge found that the District's interest in promoting the efficiency of its services outweighs Evans's First Amendment interests in making her COVID comment. Id. at 18. The trial judge concluded, "the District did not violate Evans's First Amendment right to speak on a matter of public concern." Id. at 19.

{¶34} Concerning Evans's arguments on content and view point discrimination under the First Amendment, the trial judge found, "Evans admitted that the District did not tell employees or students that they could not discuss COVID, effectively dispelling her claim that the District discriminated based on the content of her comment. 2R. at 687. Likewise, the Hearing Officer's findings demonstrate that the District's actions were not taken simply to avoid the 'discomfort and unpleasantness' that accompany an unpopular viewpoint, but instead in response to the disruption that Evans's comment caused. As

already discussed, Evans's COVID comment materially and substantially disrupted Liberty's learning environment. I, therefore, conclude that the District did not engage in unconstitutional content or viewpoint discrimination under the First Amendment." *Judgement Entry* at 19.

**{¶35}** Concerning Evans's Fourteenth Amendment claims the trial judge found that the District's policies, on their face, do not target any suspect classifications; Evans does not allege that she is a member of a class that would warrant heightened scrutiny; Evans has provided little evidence beyond bare assertions that the District selectively enforced its policies to target conservatives; and the record in fact indicates that the District enforced its policies against a "liberal" teacher for improper social media use and discussions in the classroom.  See 2R. at 838-842. The trial judge found that "the District did not target a suspect class when it enforced its policies." Id. at 21-22.

**{¶36}** Further, "The United States Supreme Court's holding in *Engquist v. Oregon Department of Agriculture* explicitly excluded the 'class-of-one' theory from public-employment cases. 553 U.S. 591, 607, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) ('the class-of-one theory of equal protection has no application in the public employment context'). Nothing Evans puts forward detracts from that observation or *Engquist's* applicability to her case." *Judgment Entry* at 24.

**{¶37}** Finally, the trial judge found Evans's vagueness challenge fails because the District's policies and her training on those policies, provided sufficient notice that her COVID comment would lead to discipline. Id. at 26. The trial judge found Evans's arguments "concerning and unwritten (and unknowable) speech code" to be

unpersuasive because she did not identify this supposed speech code or provide evidence that it exists. Id.

**{¶38}** The trial judge found Evans's claim that she was coerced to resign was not supported by the record. The judge pointed to the fact that she was accompanied at the meeting by Attorney Gary Yashko. Attorney Yashko received the District's call that it would recommend termination. Attorney Yashko even helped Evans draft her letter of resignation. 2R. at 716. Further, Attorney Yashko told Evans that, had she requested a hearing to call her own witnesses and present evidence before an impartial adjudicator, she would have had such an opportunity. 2R. at 720, 884. *Judgment Entry* at 28-29.

**{¶39}** The trial judge affirmed the UCRC's determination. Id. at 30. On March 9, 2023, the trial judge issued a 30-page decision finding that the UCRC's determination was not unlawful, unreasonable, or against the manifest weight of the evidence.

*Assignments of Error*

**{¶40}** Evans raises one Assignment of Error,

**{¶41}** "I. THE LOWER COURT ERRED BY AFFIRMING THE UCRC'S DETERMINATION THAT APPELLEE OLENTANGY LOCAL SCHOOL DISTRICT HAD TERMINATED APPELLANTS' EMPLOYMENT FOR CAUSE."

**Standard of Appellate Review**

**{¶42}** In an appeal from a decision of the court of common pleas affirming the UCRC's decision, reviewing courts do not use the standard of review provided for by in R.C. 119.12 concerning appeals from orders or decisions of administrative agencies. *Brooks v. Ohio Dept. of Job & Family Servs.* 10th Dist. Franklin No. 08AP-414, 2009-Ohio-817, ¶9; *Parrett v. Administrator, Unemployment Compensation Review Comm'n,*

4th Dist. Pickaway No. 16CA15, 2017-Ohio-2778, ¶13. In *Irvine v. Unemp. Comp. Bd. of Review,* 19 Ohio St.3d 15, 17–18, 482 N.E.2d 587, 590 (1985), the Ohio Supreme Court held that reviewing courts may reverse "just cause" determinations "if they are unlawful, unreasonable, or against the manifest weight of the evidence." The court noted that while appellate courts are not permitted to make factual findings or to determine the credibility of witnesses, they do have the duty to determine whether the board's decision is supported by the evidence in the record. Id. at 18, 482 N.E.2d at 590; *Tzangas, Plakas & Mannos*, 73 Ohio St.3d 694, 696, 1995-Ohio-206, 653 N.E.2d 1207. This duty is shared by all reviewing courts, from the first level of review in the common pleas court, through the final appeal in the Ohio Supreme Court. Id.; *See also, Struthers v. Morell*, 164 Ohio App.3d 709, 2005-Ohio-6594, 843 N.E.2d 1231 (7th Dist.), ¶14; *Marlatt v. Ohio Dept. of Job and Family Services*, 5th Dist. Guernsey No. 22 CA 000022, 2023-Ohio-630, ¶13. The Court further cautioned,

> To apply the same standard at each appellate level does not result in a de novo review standard. As this court stated in Irvine, "[t]he fact that reasonable minds might reach different conclusions is not a basis for the reversal of the board's decision." Irvine at 18, 19 OBR at 15, 482 N.E.2d at 590. The board's role as factfinder is intact; a reviewing court may reverse the board's determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence.

*Tzangas, Plakas & Mannos*, 73 Ohio St.3d at 697, 1995-Ohio-206, 653 N.E.2d 1207.

**Manifest weight**

{¶43}  In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d

517, the Ohio Supreme Court clarified the standard of review appellate courts should apply when assessing the manifest weight of the evidence in a civil case. *SST Bearing Corp. v. Twin City Fan Companies, Ltd.,* 1st Dist. Hamilton No. C110611, 2012–Ohio–2490, ¶ 16. The Ohio Supreme Court held the standard of review for manifest weight of the evidence for criminal cases stated in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), is also applicable in civil cases. *Eastley*, at ¶ 17–19, 972 N.E.2d 517.

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a [hearing], to support one side of the issue rather than the other. It indicates clearly to the [finder of fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) Black's, supra, at 1594.

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541(1997).

**{¶44}** Recently, the Ohio Supreme Court again addressed the appropriate standard for reviewing courts to employ when conducting a manifest weight of the evidence review. In State v. Jordan, Slip Op. No. 2023-Ohio-3800, the Court reiterated that the standard set forth in State v. Thompkins, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), is appropriate,

> [W]hen an appellate court reviews whether a judgment is against the manifest weight of the evidence, the court looks at the entire record and "'weighs the evidence and all reasonable inferences, considers the

credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [decision] must be reversed, and a new [hearing] ordered.'" [*Thompkins*] at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). Sitting as the "thirteenth juror," the court of appeals considers whether the evidence should be believed and may overturn a [decision] if it disagrees with the trier of fact's conclusion. See id.

*Jordan*, ¶17. "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley*, at ¶ 19.

**{¶45}** However, this standard of review must be modified slightly when reviewing an appeal from a decision rendered by the UCRC because the Ohio Supreme Court has repeatedly told us that appellate courts are not permitted to determine the credibility of witnesses in those cases. *Simon v. Lake Geauga Printing*, 69 Ohio St.2d 41, 44, 430 N.E.2d 468(1982); *Irvine v. Unemp. Comp. Bd. Of Review*, 19 Ohio St.3d 15, 17-18, 482 N.E.2d 587(1985); *Tzangas, Plakas & Mannos v. Ohio Bur. Of Emp. Serv.*, 73 Ohio St.3d 694, 696, 653 N.E.2d 1207(1985); *Williams v. Ohio Dept. of Job and Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶20.

**{¶46}** We further note that we are required to focus on the decision of the commission, rather than that of the trial court. *Irvine v. State Unemp. Comp. Bd. of Rev.*, 19 Ohio St.3d 15, 17, 482 N.E.2d 587 (1985), ¶18; *Huth v. Director, Ohio Dept. of Job*

*and Family Services*, 5th Dist. Tuscarawas No. 2014 AP 03 0011, 2014-Ohio-5408; *Perkins v. Ohio Dep't of Job & Family Servs.*, 10th Dist. Franklin No. 18AP-900, 2019-Ohio-2538, 2019 WL 2605225, ¶ 11, *citing Carter v. Univ. of Toledo*, 6th Dist. No. L-07-1260, 2008-Ohio-1958, 2008 WL 1837254, ¶ 12; *Meinerding v. Coldwater Exempted Village School Dist. Bd. of Education*, 3rd Dist. No. 10-19-06, 2019-Ohio-3611, 143 N.E.3d 1147, ¶ 18.

**Unemployment Compensation**

{¶47}  Unemployment compensation provides temporary income to workers who lose their jobs through no fault of their own. *Irvine v. Unemployment Comp. Bd. Of Rev.,* 19 Ohio St.3d 15,17, 482 N.E.2d 587. For example, discharge due to layoff, plant closure or work slowdown. See, *Irvine* at 17, *quoting Leach v. Republic Steel Corp.*, 176 Ohio St. 221, 223, 27 O.O.2d 122, 199 N.E.2d 3 (1964); *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶ 22. However, not all workers are eligible for unemployment benefits. For example, workers who were fired with just cause cannot receive benefits. R.C. 4141.29(D)(2)(a); *Marlett v. Ohio Department of Jobs and Family Services*, 5th Dist. Guernsey No. 22CA00022, 2023-Ohio-630, ¶14.

{¶48}  For purposes of unemployment compensation, the focus is on whether the employee is unemployed through no fault of their own. R.C. 4141.29(D)(2)(a) provides:

(D) * * * [N]o individual may * * * be paid benefits * * *:

(2) For the duration of the individual's unemployment if the director finds that:

(a) The individual quit his work without *just cause* or has been discharged for *just cause* in connection with the individual's work, * * *.

Emphasis added. "Thus, fault is essential to the unique chemistry of a just cause termination." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d at 697–698, 653 N.E.2d 1207; *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶23. Fault, however, is not limited to willful or heedless disregard of a duty or a violation of an employer's instructions. *Williams*, 129 Ohio St.3d 332 at ¶ 24, *citing Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d at 698. Fault may arise from willful or heedless disregard of a duty, a violation of an employer's instructions, or unsuitability for a position. *Williams* at ¶ 24; *Moore v. Ohio Unemp. Comp. Rev. Comm.*, 10th Dist. Franklin No. 11AP-756, 2012-Ohio-1424, ¶ 21. The critical issue is whether the employee's actions demonstrate an unreasonable disregard for an employer's best interest. *Janovsky v. Ohio Bureau of Employment Services*, 108 Ohio App.3d 690, 694 671 N.E.2d 611 (2nd Dist. 1996); *Peterson v. Director*, 4th Dist. Ross No. 03CA2738, 2004-Ohio-2030, ¶38; *Kiikka v. Administrator, Bureau of Employment Services*, 21 Ohio App.3d 168, 169, 486 N.E.2d 1233 (8th Dist. 1985); *Gregg v. SBC Ameritech*, 10th Dist. No. 03AP–429, 2004–Ohio–1061, ¶39; *Quartz Scientific, Inc. v. Ohio Bur. Of Unemp. Comp.*, 11th Dist. Lake No. 2012-L-0090, 2013-Ohio-1100, ¶5.

{¶49} This does not mean that an employee's behavior must consist of misconduct, but it does require some degree of fault on the part of the employee. *Quartz,* ¶15, *citing Sellers v. Bd. of Rev.*, 1 Ohio App.3d 161, 164, 440 N.E.2d 550 (10th Dist. 1981). In *Cassaro v. Ohio Dept. of Job & Family Servs.*, 3rd Dist. Crawford No. 3-16-08, 2016-Ohio-7643, the court agreed noting,

> Likewise, "courts have repeatedly held that a discharge is considered

for just cause when an employee's conduct demonstrates some degree of fault, such as behavior that displays an unreasonable disregard for his employer's best interests." Markovich v. Employers Unity, Inc., 9th Dist. Summit No. 21826, 2004–Ohio–4193, ¶ 8, *citing Tzangas, Plakas & Mannos,* 73 Ohio St.3d 694, at paragraph two of the syllabus, *Kiikka* at paragraph two of the syllabus, and *Sellers v. Bd. of Rev.*, 1 Ohio App.3d 161 (10th Dist. 1981), paragraph two of the syllabus.

Id. at ¶16.

### Liberal Construction

**{¶50}** R.C. 4141.46 requires that the sections of R.C. Chapter 4141 "shall be liberally construed." R.C. 4141.46 does not say the Unemployment Compensation Act shall be liberally construed in favor of or against either party. Bernard v. Unemp. Comp. Rev. Comm., 136 Ohio St.3d 264, 994 N.E.2d 427, ¶11.

The Commission is not required to find in favor of coverage except when ineligibility for coverage is shown to a moral certainty. The Commission is charged only to resolve any material doubt in favor of coverage, and in so doing it must rely on the facts presented and is not bound by any particular nomenclature which parties adopt, or fail to.

*Ashwell v. Ohio Dept. of Jobs and Family Services*, 2nd Dist. Montgomery No. 20522, 2005-Ohio-1928, ¶79. "Although unemployment compensation statutes are to be liberally construed, neither the agency nor the trial court has a duty to construe facts more favorably to either party. *Dailey v. Admr. Ohio Bur. of Emp. Services*, 8th Dist. No. 52633, 1987 Ohio App. LEXIS 5607, 1987 WL 5642." *Burns v. Director, Ohio Dept. of Job and*

*Family Services*, 11th Dist. Nos. 2004-T-0071, 2004-T-0072, 2005-Ohio-6290, ¶47; *Accord, Shephard v. Ohio Dept. of Job and Family Services*, 166 Ohio App.3d 747, 2006-Ohio-2313, 853 N.E.2d 335 (8th Dist.), ¶20.

**{¶51}** The "liberal construction" requirement of R.C. 4141.46 means that the Unemployment Compensation Act should be construed to promote the "humane purpose" of enabling unfortunate employees who become unemployed through no fault of their own "to subsist on a reasonably decent level…" *Sharp v. Union Carbide Corp.*, 38 Ohio St.3d 69, 71, 525 N.E.2d 1386(1988); *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶ 22. In other words, we can liberally construe the Act to provide unemployment benefits to employees who are unemployed through no fault or misconduct on their part. *Williams* at ¶23 ("Fault on the employee's part separates him from the Act's intent and the Act's protection.").

**{¶52}** Thus, this Court must determine if the Review Commission's finding that Evans was terminated with just cause was unlawful, unreasonable, or against the manifest weight of the evidence. In other words, the issue is whether Evans has the right to unemployment compensation benefits because the District terminated her employment without just cause as defined within the unemployment context. *Case W. Res. Univ. v. Statt*, 8th Dist. Cuyahoga No. 97159, 2012-Ohio-1055, ¶ 13.

**Issue for Appellate review**: *Whether the UCRC's decision is unlawful, unreasonable or against the manifest weight of the evidence.*

*Coercion and lack of a hearing*

**{¶53}** Evans first contends that she was coerced into resigning. [Appellant's brief at 18-19]. She further contends that the district terminated her employment without

affording her a hearing. [Appellant's brief at 20-21].

{¶54} In her decision, the Hearing Officer noted, "an employee who resigns in anticipation of being discharged must be judged by the same criteria as if the discharge had actually taken place. In such a case, the employee has just cause to quit employment only if the employer does not have just cause to discharge the employee." UCRC Decision July 29, 2022 at 5, 2R. 882. In other words, the Hearing Officer reviewed the claim as if Evans had been fired. Thus, the Hearing Officer utilized the correct standard. In the case at bar, the focus is on whether the District had just cause to terminate Evans's employment.

*The record contains competent, credible evidence that Evans resigned in lieu of requesting a Loudermill hearing*

{¶55} In Ohio, a state-employed teacher or aide possesses a property interest in continued employment. See R.C. 124.11 and 3319.081. Before the state may deprive an employee of that interest, the Due Process Clause requires certain procedural safeguards, an example being a Loudermill hearing. *See Cleveland Bd. of Edn. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). As the *Loudermill* Court noted in the pre-deprivation due process hearing, "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See *Arnett v. Kennedy,* 416 U.S., at 170–171, 94 S.Ct., at 1652–1653 (opinion of Powell, J.); id., at 195–196, 94 S.Ct., at 1664–1665 (opinion of White, J.); *see also Goss v. Lopez,* 419 U.S., at 581, 95 S.Ct., at 740. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory

employee." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). *See also, Ohio Assn. of Pub. School Emp., AFSCME, AFL-CIO v. Lakewood City School Dist. Bd. of Edn.*, 68 Ohio St.3d 175, 177, 624 N.E.2d 1043, 1045 (1994) (discussing pre and post deprivation hearing requirements).

{¶56} The record establishes that at the April 14, 2021 investigatory meeting, Evans was given notice of the charges against her, an explanation of the District's evidence, and at the end of the hearing an opportunity for her and Attorney Yashko to speak in order to present her side of the story. 1R. at 162-165; 2R. at 528; 852; 861. Evans admitted that she was permitted to speak at the meeting. 2T. at 683. The record further establishes that Evans was accompanied at the meeting by Attorney Gary Yashko. 1R. at 206; 2R. at 709.

{¶57} Attorney Yashko received the District's call that it would recommend termination. Attorney Yashko helped Evans draft her letter of resignation. 2R. at 716. Further, Attorney Yashko told Evans that, if she requested a hearing to call her own witnesses and present evidence before an impartial adjudicator, the District would give her that opportunity, in the event she chose not to resign. 2R. at 720, 884. Evans testified that when she submitted her letter of resignation, she had hopes of attaining employment in a different school district. 1R. at 212.

{¶58} Iceman testified that Attorney Yashko was informed the District was going to move forward with termination of Evans's employment; however, Evans would be given the option to resign if she wanted too. 1R. at 166. Iceman testified that Evans submitted a letter of resignation dated April 16, 2021. Id. Iceman testified that Evans's resignation was accepted on April 22, 2021. 1R. at 16. Iceman testified that if she had not opted to

resign, Evans would have received a Loudermill hearing. 2R. at 860. A Loudermill hearing was not scheduled in Evans' case because the District received her resignation letter. Id.

**{¶59}** We find the record contains competent, credible evidence supporting the Hearing Officer's finding that "[Evans] would have been given a proper due process hearing prior to being formally discharged, but she was offered the option of resigning. On April 16, 2021, [Evans] submitted her resignation, effective at the end of the 2020-2021 school year. On April 22, 2021, the Board accepted [Evans's] resignation effective May 27, 2021." UCRC Decision at 5.

**{¶60}** The record contains no evidence that Evans was unaware that she could request a Loudermill hearing instead of resigning. The record contains no evidence that Evans asked for a Loudermill hearing, or that the District would have denied her such a hearing had she requested one in lieu of resigning. There is nothing in the record to suggest the Hearing Officer improperly placed the burden of proof on Evans.

**{¶61}** Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, we cannot reach the conclusion that the hearing officer lost her way and created a manifest miscarriage of justice. We find that the UCRC's decision that the District did not violate Evans' procedural due process rights by terminating her without a hearing is not unlawful, unreasonable or against the manifest weight of the evidence.

*The record contains competent credible evidence that the District had "just cause" to discharge Evans*

**{¶62}** The Hearing Officer found that Evans,

[H]ad a prior history of counseling, specialized training, and discipline after making disparaging public social media posts, asking inappropriate questions about a student's parent's' nationality, and making racially-charged and insensitive comments to a Black student. Although [Evans] asserted that she had no intention of harming anyone through her posts or commentary, she appears to be either unable or unwilling to fully comprehend the significant impact of her conduct on students and the broader community, the disruption to a positive school environment, and the effect on the school's public image. The investigation team found [Evans] to be untrainable due to her inability to adapt to the societal changes around her (specifically at OLHS).

* * *

[Evans] acknowledged, in hindsight, that she should not have made her October 2020 comments or her April 7, 2021 statement. [Evans] received training and counseling in 2019 and 2020 but nevertheless continued to voice her opinions without regard to her role and the employer's immense task and precarious position. [Evans] did not exhibit professionalism, sound judgment, or promote good public relations, and her conduct clearly displayed that she could not be trained to act in the employer's best interest. Based on the above, the Hearing Officer has determined that the employer had just cause to discharge [Evans]. [Evans's misconduct was contrary to the employer's best interests and represents fault that will serve to suspend her unemployment compensation benefits.

Accordingly, [Evans] quit her employment with the Olentangy Local Board of Education without just cause when presented with an inevitable discharge.

*UCRC Decision* at 5-6.

**{¶63}** The District employs a progressive disciplinary policy. 1R. at 170. The record established that with respect to Evans's previous disciplinary actions, the district chose to support Evans through additional training so that she could maintain her employment. 1R. at 173-174. Iceman testified that the decision to terminate Evans's employment was the "end of a …sequential…number of disciplines…for violating the strict policy, a final warning that was [from] a discipline from March of 2019…and continued unprofessionalism." 1R. at 168-169. Iceman testified that this was Evans's fourth incident in two years. Id. at 170.

*Progressive disciplinary policy and past disciplinary actions*

**{¶64}** It has been observed that "[p]rogressive disciplinary systems create expectations on which employees rely," and "[f]airness requires an employee not be subject to more severe discipline than that provided for by company policy." *Mullen v. O.B.E.S.,* 8th Dist. No. 49891 (Jan. 16, 1986). Ohio appellate courts have "generally concluded that where a company bypasses its progressive disciplinary system and terminates an employee, that employee's discharge is without cause for unemployment compensation purposes." *Peterson v. Dir., Ohio Dept. of Job & Family Servs.*, 4th Dist. 03CA2738, 2004–Ohio–2030, ¶ 20. *See also Apex Paper Box Co. v. Admr., Ohio Bur. of Employment Serv.,* 8th Dist. No. 77423 (May 11, 2000) ("an employer's failure to follow the disciplinary procedure set out in the work rules does not constitute just cause for

termination"); *Pickett v. Unemp. Comp. Bd. of Rev.*, 55 Ohio App.3d 68, 70 (8th Dist. 1989) (Despite employer's contention that employee could be discharged summarily because he had previously been discharged, "there is nothing in the record to justify ignoring the progressive discipline requirement"); *Interstate Brands Corp. v. Cogar*, 8th Dist. No. 48704 (June 13, 1985) (Unemployment Compensation Board of Review could reasonably have concluded that employer's bypass of progressive disciplinary system was too severe under the facts, and therefore, the discharge of employee was without just cause); *Peterson v. Director*, 4th Dist. No. 03CA2738, 2004-Ohio-2030, 2004 WL 869373, ¶ 20, *citing In re Claim of Frazee*, 10th Dist. No. 84AP284 (Dec. 13, 1984); *See also, Eagle-Picher Industries, Inc. v. Ohio Bur. Of Emp. Serv.*, 65 Ohio App.3d 548, 584 N.E.2d 1245(3rd Dist. 1989); *Ohio Assn. Pub. School Emp. V. Ohio Dept. of Job & Family Services*, 10th Dist. Franklin No. 12-AP-81, 2012-Ohio-6210, ¶21; *Coles v. United Parcel Service,* 7th Dist. Mahoning No 12 MA 22, 2013-Ohio-1428, ¶20. Thus, prior disciplinary actions involving the employee are relevant in considering whether the employer followed its own progressive disciplinary policy. Additionally, we can find evidence that an employer followed its progressive disciplinary policy to support a finding of "just cause." *Eagle-Picher Industries, Inc. v. Ohio Bur. Of Emp. Serv.*, 65 Ohio App.3d 548, 584 N.E.2d 1245(3rd Dist. 1989).

**{¶65}** In this respect, when the employer bases a decision to terminate an employee's employment on a history of disciplinary violations, the hearing officer can consider the employee's previous disciplinary record. *Ogburn v. Administrator, Ohio Bur. Of Employment Services*, 7th Dist. Mahoning No. 97 CA 242, 1998 WL 775027(Nov. 2, 1998) at *5 ("Case law discussing just cause also supports the propriety of the board's

consideration of appellant's previous disciplinary record."); *Chardon Local School District Board of Ed. V. Keller*, 11th Dist. Geauga No. 2013-G-3159, ¶26 ("Further, it was not reasonable for the Hearing Officer to limit the just cause determination to this particular incident, as the Board's decision to terminate Yowell relied upon his prior disciplinary infractions, as evidenced by the termination letter."); *City of Dublin v. Clark*, 10th Dist. Franklin Nos. 05AP-431; 05AP-450, 2005-Ohio-5926, ¶30 ("[Clark] was given several written and verbal warnings that he was falling short in job productivity, and Hammersmith had several counseling discussions with Clark about his work."); *Crisp v. Scioto Residential Services*, 4th Dist. Scioto No. 03CA2918, 2004-Ohio-6349, ¶25 ("Here, the hearing officer could reasonably have concluded that the disciplinary actions before October 2001 were relevant to the offense at issue because they involved similar infractions.").

**{¶66}** The record demonstrates that Evans received training on November 23, 2020, December 2, 2020 and December 9, 2020 on microaggression and restorative education. 1R. at 163; 2R. at 480. Evans further received trainings on the professional use of social media; trainings on the Code of Professional Conduct for Educators on April 4, 2019, September 4, 2019 and August 21, 2022, and training on implicit bias and building a safe and supportive school environment. 1R. at 163-164; 2R. at 480. These training sessions all took place before Evans made her April 7, 2021 COVID comments.

**{¶67}** The April 5, 2019 letter regarding Evans's "Unpaid suspension, Directives and Final Warning" clearly informed Evans that her "insensitive comments" contradicted the District's mission statement and created "considerable disruption" to the District's operations. The letter clearly informed Evans of her "essential functions" as an employee.

Evans was also advised that concerns were raised by "several students, parents and/or other members of the public." 2R. at 445.

**{¶68}** From April 2019 through April 2021, Evans's conduct caused multiple students to report her conduct and prompted more than a dozen parents, teachers, and Liberty alumni to file complaints with the District. Judgment Entry at 15. Upon our own independent review of the record, we find that the record contains competent, credible evidence that demonstrates Evans's comment hurt her relationship with her students and the parents. 1T. at 172-73; 174; 175; 187; 2R. at 472-474; 515.

**{¶69}** The record supports that Evans was informed as early as 2019 that her insensitive comments were contradictory to the District's mission statement and "created considerable disruption to our operation." 2R. at 446. (Apr. 5, 2019 letter to Evans from Todd R. Meyer, Chief Operations Officer regarding the Apr. 4, 2019 pre-disciplinary hearing). (Evans signed this letter on April 9, 2019. 2R. at 447). In response to a question during the investigatory hearing, Evans stated that she was not familiar with the Professional Code of Conduct for Educators. 2R. at 511.

**{¶70}** In a letter dated September 29, 2020, Evans was informed that her comment with respect to "Tell that to the English Department," demonstrated a repeated and persistent pattern of poor judgment. 2R. at 483. Evans was further informed that her comments have compromised her ability to work with staff, created a negative influence for students and violated a position of trust as a positive role model for students. Id. Evans was directed "to refrain from engaging in any other unprofessional or unethical behavior or violations of Board policies. If you do not follow these directives, you will face further disciplinary action up to and including termination." Id. (Emphasis added).

{¶71} Evans had multiple disciplinary incidents, disrupting the high school's operation and its learning environment each time. Because of this, the Hearing Officer found that Evans "appear[ed] to be either unable or unwilling to fully comprehend the significant impact of her conduct on students and the broader community, the disruption to a positive school environment, and the effect on the school's public image." UCRC Decision at 5.

{¶72} Evans admitted that she understood "what I am suppose to do and I didn't do what I was suppose to do." 1R. at 164. She further admitted that she was advised April 2, 2019 and September 29, 2020 that any future violations of school policy would result in discipline up to and including termination of employment. 1R. at 169; 2R. at 445; 682.

{¶73} This was Evans's fourth infraction in two years. And yet, as observed by the Hearing Officer, Evans "continued to voice her opinions" "without regard to her role [,] and . . . her conduct clearly displayed that she could not be trained to act in the employer's best interests." 2R. at 884-885.

{¶74} The record contains competent, credible evidence that the COVID comment was not an isolated incident upon which the District based its decision to terminate Evans's employment. The record clearly establishes that her discharge was the result of a history of repeated disciplinary infractions, each of which created considerable disruption to the District's operation. The record establishes that from April 2019 through April 2021, Evans's conduct caused multiple students to report her conduct and prompted more than a dozen parents, teachers, and Liberty alumni to file complaints with the District. The record contains competent, credible evidence that the District provided Evans with notice of the problems caused for students, parents and members of the public

each time she made a disparaging public social media post, asked inappropriate questions, and made racially-charged and insensitive comments. The District continued to employ Evans while working with her to address those problem areas by providing her with training and instruction.

{¶75} Thus, the record contains competent, credible evidence supporting the hearing officer's finding that Evans did not exhibit professionalism, sound judgment, or promote good public relations, and her conduct clearly displayed that she could not be trained to act in the employer's best interest.

{¶76} The record establishes that the fault for Evans's discharge lies with her inability to learn from the numerous training sessions that the District provided to her, as well as the previous disciplinary hearings in which she was involved, to simply keep her inappropriate comments out of the school environment. The record contains competent, credible evidence that in spite of repeated warnings, Evans appears to be either unable or unwilling to fully comprehend the significant impact of her conduct on students and the broader community, the disruption to a positive school environment, the effect on the school's public image, and that it was not in the best interest of the District. The record supports that Evans's conduct after repeated warnings, training, and previous disciplinary hearings evidences an unreasonable disregard for her employer's best interests.

{¶77} Upon our independent review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, we cannot reach the conclusion that the hearing officer lost her way and created a manifest miscarriage of justice. We conclude that the UCRC's decision in this case that Evans misconduct was contrary to the employer's best interests and represents fault that will serve to suspend her

unemployment compensation benefits, and that Evans quit her employment without just cause when presented with an inevitable discharge, was neither unlawful, unreasonable, nor against the manifest weight of the evidence.

**Wrongful termination**

{¶78} Although Evans raised only a single assignment of error, in her brief she raises sub-issues that assert, in essence, that the District fired her for engaging in protected activity, i.e., free speech. Therefore, Evans suggests that the finding by the Hearing Officer that she quit without just cause or her employment was terminated by the District with just cause is against the manifest weight of the evidence.

{¶79} An unfair firing is not the same thing as an illegal firing. Situations which may give rise to a wrongful termination claim can include when an employee is fired for a discriminatory reason, such as age, race or sex; when an employee is fired in retaliation to complaints about harassment or whistle-blowing, and where an employee is fired for exercising their protected rights. If an employee is fired for engaging in protected activity and through no fault of their own, the situation may give rise to a wrongful termination claim in addition to unemployment compensation benefits.

It is important to distinguish between just cause for discharge in the context of unemployment compensation and in other contexts. An employer may justifiably discharge an employee without incurring liability for wrongful discharge, but that same employee may be entitled to unemployment compensation benefits. *See Adams v. Harding Machine* Co., 56 Ohio App.3d 150, 155, 565 N.E.2d 858 (3d Dist. 1989). This is so because just cause, under the Unemployment Compensation Act, is predicated upon

employee fault. *Tzangas*, 73 Ohio St.3d at 698, 653 N.E.2d 1207; *Adams,*

56 Ohio App.3d at 155, 565 N.E.2d 858. We are, therefore, unconcerned

with the motivation or correctness of the decision to discharge. *Friedman v.*

*Physicians and Surgeons Ambulance Serv.*, 9th Dist. No. 10287, 1982 WL

2867 (Jan. 6, 1982). The Act protects those employees who cannot control

the situation that leads to their separation from employment. *See Tzangas*,

73 Ohio St.3d at 697, 653 N.E.2d 1207.

*Durgan v. Ohio Bur. of Emp. Serv.*, 110 Ohio App.3d 545, 549–550, 674 N.E.2d 1208 (9th

Dist. 1996); *Clucas v. RT80 Express, Inc.*, 9th Dist. Lorain No. 11CA009989, 2012-Ohio-

1259, ¶5; *Peterson v. Director, Ohio Dept. of Job & Family Services*, 4th Dist. Ross No.

03CA2738, 2004-Ohio-2030, ¶17.

{¶80} As we have already explained, Evans's employment was not terminated

based upon the content of her COVID statement; rather the termination of her

employment was based upon multiple disciplinary violations evidencing an unreasonable

disregard for her employers' best interests. Accordingly, we find Evans's First

Amendment and Equal protection arguments fail to establish that the Hearing Officer's

decision was unlawful, unreasonable, or against the manifest weight of the evidenced.

{¶81} The March 9, 2023 judgment entry of the Delaware County Court of Common Pleas is affirmed.

By Gwin, P.J., and

Wise, J., concur;

King, J., dissents

*King, J. dissents*

{¶ 82} I would reverse the determination of the UCRC because I conclude Evans's COVID "microaggression" does not represent just cause sufficient to deny benefits. The majority of the panel concludes otherwise; therefore, I dissent.

{¶ 83} To begin, I disagree that the burden of proof rests on any claimant. The current formulation of the statute states, "No person shall impose upon the claimant or the employer any burden of proof as is required in a court of law." R.C. 4141.281(C)(2). As our colleagues in the Seventh District recognized, this statutory change supersedes prior case law. *Struthers v. Morell*, 164 Ohio App.3d 709, 2005-Ohio-6594, 843 N.E.2d 1231, ¶ 12 (7th Dist.). Under this proper formulation, we cannot uphold a UCRC determination under the notion that a claimant failed to carry the burden of proof. In my view, this error in formulation was present in the trial court's opinion, and then repeated in the majority's opinion. *See,* Trial Court's March 9, 2023 Judgment Entry at page 10.

{¶ 84} The purpose of unemployment compensation is to provide financial assistance to individuals who have lost their employment through no fault of their own, i.e., without just cause. *See Salzl v. Gibson Greeting Cards, Inc.,* 61 Ohio St.2d 35, 39, 399 N.E.2d 76 (1980). In order to accomplish this purpose, we are directed to liberally interpret certain statutes. R.C. 4141.46. In this context, both the Third and Seventh Districts have concluded that the legislative intent is to presume that employees are entitled to receive benefits. *Tomlinson v. Ohio Department of Job and Family Services*, 3d Dist. Allen No. 1-09-02, 2009-Ohio-3414, ¶ 6; *Abate v. Wheeling-Pittsburgh Steel Corp.,* 126 Ohio App.3d 742, 748-749, 711 N.E.2d 299 (7th Dist.1998). The Second, Sixth, Eighth, Ninth, and Tenth Districts arrived at a similar conclusion as well. *Bates v.*

*Airborne Express, Inc.,* 186 Ohio App.3d 506, 2010-Ohio-741, 928 N.E.2d 1168, ¶ 9 (2d Dist.); *Schivelbein v. Riverside Mercy Hospital,* 6th Dist. Lucas No. L-11-1208, 2012-Ohio-3991, ¶ 13; *Shephard v. Ohio Department of Job and Family Services,* 166 Ohio App.3d 747, 753, 2006-Ohio-2313, 853 N.E.2d 335, ¶ 21 (8th Dist.); *Niskala v. Director, Ohio Department of Job & Family Services,* 9th Dist. Medina No. 10CA0086-M, 2011-Ohio-5705, ¶ 9; *Bennett v. Department of Job and Family Services,* 10th Dist. Franklin No. 11AP-1029, 2012-Ohio-2327, ¶ 6.  It also appears the Twelfth District reached the same conclusion.

{¶ 85} Before the Twelfth District, the UCRC argued that this presumption in favor of awarding benefits was improper, but the court of appeals rejected the argument. *Harmon v. Ohio Department of Job and Family Services,* 12th Dist. Butler No. CA2021-08-105, 2022-Ohio-1142, ¶ 31-32.  Our colleagues' determinations are further bolstered by the subsequent Supreme Court of Ohio case holding courts are no longer required to defer to administrative agency interpretations.  *TWISM Enterprises, L.L.C. v. State Board of Registration for Professional Engineers & Surveyors*, --- N.E.3d ---, 2022-Ohio-4677, ¶ 3.

{¶ 86} For the sake of statewide consistency, I would follow the overwhelming majority of our sister appellate courts and begin with the proposition a claimant is entitled to receive benefits.  In this light, under R.C. 4141.281(C)(2), the hearing officer must ensure that evidence at hand is sufficient to overcome the presumption a claimant is entitled to receive benefits before denying benefits.  As it relates here, the hearing officer was required under R.C. 4141.29(D)(2) to determine if the submitted evidence sufficiently demonstrated that Evans was terminated for just cause.

{¶ 87} I agree with the majority that the hearing officer correctly reviewed the alleged inevitable discharge under the standard of whether the employer had just cause to terminate employment. But I do not agree the evidence before the hearing officer was sufficient to demonstrate just cause and thus rightly deny Evans benefits.

{¶ 88} Whether a claimant's conduct rises to the level of just cause is not subject to a bright line rule, instead it must be examined on a case-by-case basis. *Irvine v. State Unemployment Compensation Board of Review,* 19 Ohio St.3d 15, 17, 482 N.E.2d 587 (1985). Although, the Supreme Court did provide some rough guidance by stating: " 'Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.' " *Id.,* quoting *Peyton v. Sun T.V.,* 44 Ohio App.2d 10, 12, 335 N.E.2d 751 (10th Dist.1975).

{¶ 89} Moreover, there is a distinction between the conduct that may warrant dismissal and "the further degree of misconduct or fault required on the part of the employee to justify a denial of unemployment benefits." *James v. Ohio State Unemployment Review Commission,* 10th Dist. Franklin No. 08AP-976, 2009-Ohio-5120, ¶ 12. In other words, an employer may have the right to discharge an employee for certain conduct, but that does not automatically equate to just cause under R.C. 4141.29(D)(2) to deny that employee benefits. In that regard, it is entirely possible Evans would fail to win a wrongful discharge claim, yet be entitled to receive benefits. As I explain below, it is unnecessary to directly reach the constitutional issues raised, although I view it presents a much more significant obstacle to the denial of benefits than stated by the majority.

{¶ 90} The proximate conduct at issue here is Evans's overheard COVID comment: "Can you believe the coronavirus came from China and that China is making money from the sales of PPE to the United States?" The school district's concern was not so much that this statement was made, but rather its impact on a particular student who was of Asian descent and became upset after hearing this comment. Indeed, the school district's brief referred to the statement itself as an "Anti-Asian microaggression." While the facts surrounding the origin of COVID-19 continue to be hotly debated, the statement itself lacks the sort of racially charged slurs, opinions, statements, or distasteful "joking" that usually precede an employee's discharge.

{¶ 91} In my view, whatever legal authority an employer has to punish a microaggression with termination, a microaggression will usually fall well short of demonstrating sufficient just cause to overcome a worker's presumption to unemployment benefits. In support of the UCRC's decision, the school district gestures at the broadly worded statement of principles adopted by the school district, and that Evans violated those rules. Again, violations of those laudable aspirations might well support lawful discharge, but not necessarily the denial of unemployment benefits. Ordinarily, the UCRC reviews the violation of company rules that are far more objective, such as being ready for work at the assigned start time, using internet for only business purposes, procedures for use of sick time, and so on. The workplace rules at issue here approach the "be a good employee and support company objectives" level of specificity that is, in my view, insufficient to support a finding of just cause for violating a company rule.

{¶ 92} As I read the record, Evans has been repeatedly disciplined and on November 17, 2020, she was placed on something roughly equivalent to a last chance

agreement. We can assume without deciding that on November 17, 2020, just cause existed to terminate her. But the school district decided to proceed otherwise. If the conduct at issue here were truly actionable, then her prior conduct would be relevant and would certainly support the UCRC's finding. But the school district gave her another chance, which it cannot now take back. Because the single microaggression is not either a violation of workplace rules or independent evidence of her unsuitability for her position, the prior discipline is of no import.

{¶ 93} Finally, I believe much of the discussion by the trial court and majority is unnecessary. With regard to Evan's claimed constitutional violations of equal protection and procedural due process, I fail to see how either is relevant to whether Evans's microaggression was sufficient just cause to support the UCRC's denial of her unemployment benefits. Those may well be independent claims related to wrongful discharge she can raise in another forum, but, as explained above, we do a disservice to the purpose and structure of the Unemployment Compensation Act to interject those here.

{¶ 94} Regarding the free speech claims, I agree the UCRC has to ensure that any denial of unemployment benefits comports with the United States Constitution. *See, e.g., Sherbert v. Verner,* 374 U.S. 398, 410, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). But the trial court's analysis expressly placed the burden on Evans to prove a first amendment violation. This was an error under R.C. 4141.281(C)(2). The factors examined by the federal district court in *Brandenburg v. Housing Authority of Irvine,* 253 F.3d 891, 897 (6th Cir.2001), placed the burden on the former employee because the employee as plaintiff had the burden of proof. That is not the case here. Thus, this illustrates the danger of

conflating standards relevant to wrongful discharge cases with the standard of just cause under the unemployment compensation system.

{¶ 95} Further, whenever the UCRC has to assure itself it is behaving constitutionally in denying benefits, it should proceed cautiously in applying federal precedent. As illustrated above, the framework in which those cases arise are often remarkably different. Moreover, as discussed by Judge Murphy in *Bennett v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 977 F.3d 530, 547 (6th Cir.2020) (Murphy, J., concurring), the "state-as-the-employer" free speech law revolves around "two incomparable values—a public employee's interest in speaking about politics and a public employer's interest in its efficient operations." If the balancing in federal court is a delicate affair with the benefit of discovery and the adversarial nature of litigation, then the UCRC should be circumspect in denying benefits under any framework driven by "two incompatible values."

{¶ 96} Thus, in my view, in many circumstances, with the difficulty in assessing this area of the law coupled with the presumption of awarding benefits, the discharged worker should receive benefits and thus avoid consideration of this perilous doctrine altogether. It follows then that I am not nearly as convinced as the trial court and the majority about a conclusion to deny benefits premised on the lack of merits of the free speech claim here. I would conclude the UCRC's determination of just cause was unreasonable and thus believe it should be reversed on that ground.